The **UNITED STATES** of America,
Appellee,

v.

**Russell DeCICCO, Rene DeCicco, Louis Markus and Gregory Parness,**
Appellants.

**Nos. 761, 762, and 763, Dockets 34011, 34096, and 34097.**

United States Court of Appeals,
Second Circuit.

Argued May 7, 1970.
Decided Nov. 16, 1970.

John Tarrant, Dept. of Justice; H. Kenneth Schroeder, Jr., U. S. Atty., for appellee.

F. Bernard Hamsher, Buffalo, N. Y., for Russell and Rene DeCicco.

Charles Patrick Bridge, Buffalo, N. Y., for Louis Markus.

Harold J. Boreanaz, Buffalo, N. Y., for Gregory Parness.

Before LUMBARD, Chief Judge, WATERMAN, Circuit Judge, and JAMESON, District Judge.*

WATERMAN, Circuit Judge:

Russell DeCicco, his wife Rene, Louis Markus, and Gregory Parness were tried jointly before Judge Henderson and a jury in the United States District Court for the Western District of New York for conspiring to transport stolen goods

* Of the District of Montana, sitting by designation.

in interstate commerce in violation of 18 U.S.C. § 2314. The jury found each defendant guilty, and defendants appeal. For reasons to be elaborated below we reverse the judgments of conviction and remand for a new trial.

The following facts were brought out at trial. Sometime during the night of August 20–21, 1968, the home of Dr. and Mrs. T. Edward Hanley in Bradford, Pennsylvania, was burglarized of 14 masterpiece paintings and two bronze statuettes valued at approximately $1,300,000.[1] The Government's principal witness, the brother of Gregory Parness, Paul Parness, who was named in the indictment as a co-conspirator but was not indicted as a codefendant, unfolded the story of appellants' involvement with the art theft and the efforts to sell the stolen art objects. Paul Parness testified that approximately two days prior to the burglary he met with Russell DeCicco at DeCicco's home in Buffalo, New York, at which time DeCicco told Parness he planned "to make a big score and that he thought he would get some valuable items out of the burglary." On August 21, shortly after the Hanley theft, Parness again talked with DeCicco, this time in the presence of Parness's brother Gregory, and of Louis Markus. DeCicco told Paul Parness he had successfully burglarized a home and made off with 14 paintings and two statues. At this conference DeCicco and Paul Parness agreed that the latter would try to find a buyer for the stolen works of art.

■ Unfortunately for the DeCiccos and the other defendants, Paul Parness led a double life, for he had been, and was during the time of these events, a paid informer for the FBI and other law enforcement agencies. After the August 21 meeting and his conversation with Russell DeCicco, Paul Parness called FBI agent Griffin and told him about it. A plan to trap DeCicco and company was then worked out, and later

in the week Paul Parness approached DeCicco and reported to him that a friend in Chicago was interested in the paintings. A price of $300,000 was subsequently agreed upon and a meeting with the fictitious buyer was tentatively set for August 29 at 6:00 p. m. at a Buffalo motel. Earlier in the day of the 29th, agent Griffin instructed Paul Parness to inform DeCicco that the meeting to exchange the art works would have to be postponed a day because the Chicago parties were having difficulty liquidating negotiable securities to raise the necessary cash. Parness then went to the DeCicco home and was told by DeCicco's wife Rene that her husband, Paul's brother Gregory, and Louis Markus had already left for Pennsylvania to bring back the paintings. She "became upset" at hearing of the delay, saying a motel room, where the paintings were to be placed, had been paid for and her husband was probably on his way back with the paintings, but she indicated she might be able to reach him by phone. Parness drove Rene to a public telephone booth in the Buffalo area and she made her call. Rene then said to Parness that she had reached her husband and had told him (by way of a code) to postpone bringing the paintings back to Buffalo until the following day. The next day, August 30, Russell DeCicco and Markus drove to Paul Parness's home in Hamburg, New York. They had returned from their trip to Pennsylvania without the paintings and they related to Paul Parness what had happened. DeCicco told Paul Parness that he, Gregory Parness, and Markus had driven to the home of a John Burke who was responsible for storing the stolen art works. Upon their arrival, Burke informed them that the local police had been "shadowing" him, but, despite that, he would pick up the paintings and would deliver them. During Burke's absence, which lasted about three hours, the trio became suspicious. When Burke re-

---

1. Among the art works stolen from the Hanley collection were paintings by Picasso, Cezanne, Goya, Renoir, Monet, Modig-liani and Gauguin, and sculpture by Degas and Rodin.

turned he reported that the police were still following him and that he had to abandon his intention of picking up the paintings, but he then told DeCicco where to find the shack where the stolen property was hidden. DeCicco, Gregory Parness, and Markus started for the shack but decided to abandon the art objects when they spotted several police cars parked behind a restaurant near the pickup area. About 15 miles down the road their car was stopped by the Pennsylvania State Police; the three men were questioned briefly and their identifications checked. They were then permitted to proceed—which they promptly did—back to Buffalo and to New York State. This August 30 conversation was concluded by DeCicco's telling Paul Parness that he was sure Burke had set him up by notifying the police and consequently that he and his wife "intended to do physical harm to [Burke] or his family."[2]

Through the testimony of another FBI agent, Francis Connors, the Government established that during the investigation of the Hanley art theft Connors had received information[3] that prompted him to contact John Burke, the harborer of the stolen property. As a result of this contact Burke took Connors and another agent early in the morning of August 29 to the shack where the 14 paintings and two statuettes were concealed. The agents removed the art works to a motel in Bradford, Pennsylvania, examined them there, and made an inventory of them. After this had been accomplished Connors was notified by Burke at about 11:00 a. m. that DeCicco, Marcus, and Gregory Parness had appeared · at Burke's home to transport the paintings to Buffalo. Sensing an opportunity for a "redhanded" capture, Connors and his companion agent returned the art works to the shack and set up surveillance. As previously related, however, DeCicco and his companions were ·tipped off that something had gone awry and, abandoning their efforts to recover the stolen property, headed back to New York State. Two months later, on October 24, 1968, Mr. and Mrs. DeCicco and Gregory Parness were arrested and charged. Louis Markus voluntarily surrendered himself to the FBI in Buffalo, New York, the following day.

We now turn to a discussion of the issues raised for adjudication upon this appeal.

### I.

In an effort to establish that Russell DeCicco and Gregory Parness had previously indulged in activity involving stolen art works, the Government's witness Paul Parness testified over objection that at a time shortly before the occurrence of the events of this case he had arranged with DeCicco for the latter to sell to an insurance company two Utrillo paintings that had been stolen in

---

2. On cross-examination Paul Parness referred to the threat to Burke about which he had testified by saying,

    I said that Mr. DeCicco told me that if he ever found out who set him up he would kill them or get at their family any way he could.

    Counsel for Gregory Parness and counsel for Louis Markus requested an instruction that the threat was not to be considered by the jury as evidence against their clients. The court did so instruct and charged that it could only be considered against Mr. and Mrs. DeCicco.

    Appellant Rene DeCicco now claims the threat should not have been attributable to her, though her counsel failed to object to the instruction when given below. At retrial of this case it should be established whether the threat was jointly made for it is not clear from the present testimony that Rene joined in the sentiments expressed by her husband. ' Also, since Rene was not present at the time her husband purportedly made the declaration, it is nonadmissible hearsay against her unless the conspiracy alleged in the indictment was still in existence when DeCicco made the statement.

3. Agent Connors had become acquainted with Burke, considered by Connors to be an informant, on a prior occasion during an investigation of a "robbery of a coin collection." Prior to Connors's trip to Pennsylvania, Burke told him he knew of the whereabouts of the stolen paintings and statues.

Buffalo. He testified that he had been informed by his brother Gregory that the paintings were available for sale, and that DeCicco later admitted to him that DeCicco had stolen the paintings and had turned them over to Gregory Parness to sell. An insurance agent corroborated Parness's story by testifying that he had transferred the recovery money, $6,700, to Paul Parness, that shortly ·after the paintings were recovered he saw DeCicco go into the restaurant where the money was passed, and that he had also been told by Paul Parness that DeCicco had called about the Utrillo transaction.

The court was careful to instruct the jury that this prior but similar act of misconduct was only germane to a resolution of the question of whether, at the time "an accused" acted in the case at trial he acted wilfully, "and not because of mistake or accident or other innocent reason." [4]

FBI agent Griffin also testified, over objection:

> I participated myself, personally, in recovering approximately a half million dollars in paintings, art objects, furs, and so forth, which were being fenced by Russell DeCicco and Gregory Parness.

And again a cautionary instruction was given to the jury.[5]

Such evidence tended to show that Russell DeCicco and Gregory Parness were in the business of stealing art treasures and thereafter dealing in them. The court endeavored to tell the jury that the probative force of the prior misconduct was to be considered by them only on the issue of whether

---

4. When the subject was first broached by the prosecution in its questioning of Paul Parness, the court instructed the jury:

> The Court: * * * This is a former act, outside of the indictment period. It is claimed by the Government, obviously, that this is a similar act. Normally, proof of a similar act is no proof at all that the act occurred again during the period that we are concerned with. However, if the proof establishes eventually in your minds that this act did occur, then you may take into consideration former acts concerning the intent of the individual defendant who is being referred to, as to whether he had knowledge and intent in the act we are concerned with, that is, the burglary and eventual scheme to transport this property, that is, these paintings, across state lines. But you do not take into consideration any former acts as any evidence whatsoever that the act occurred again. It is only a question of intent. You may consider it for that purpose only.

Later, on the same subject, the court instructed:

> The Court: * * * If the jury should find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the particular count under deliberation, then the jury may consider evidence as to an alleged earlier act of a like nature in determining the state of mind or intent with which the accused did the act charged in the particular count of the present indictment under consideration, and where proof of an alleged earlier act of a like nature is established by evidence which is clear and conclusive, the jury may draw therefrom the inference and find that in doing the act charged in the particular count under deliberation—I am talking about our case now—that the accused acted wilfully and with specific intent, and not because of a mistake or accident or other innocent purpose.

The substance of these instructions was repeated to the jury several times as the trial proceeded and once again during the court's charge prior to the jury's deliberations.

5. In addition to the somewhat egotistical Scotland Yardish comments by Agent Griffin, the jury was allowed to hear Agent Connors testify that he came to know John Burke, the harborer of the stolen art works in Pennsylvania "[d]uring the investigation of another matter involving the robbery of a coin collection." See note 3, supra. By this time the jury must have been fairly well convinced that just about everybody mentioned in the case was either in the specialized business of relieving collectors of their collections or were investigators who specialized in handling the investigations of such thefts. We caution against the interjection of this or similar comments at the retrial of these defendants for comments of this sort raise a prejudicial atmosphere of guilt by innuendo.

the accused had a specific intent to commit the crime alleged in the indictment. Inasmuch as DeCicco's and Gregory Parness's former "fencing" activities had occurred in Buffalo, New York, the Government was also seeking to have the jury infer that DeCicco and Parness intended, consistent with the prior design, to transport the stolen art treasures back to New York from Pennsylvania, thereby satisfying themselves that the interstate element of the conspiracy charged in the indictment had been proven.

■■  The court did not limit the inferences drawable from this evidence to be applicable only to defendants Russell DeCicco and Parness, but the inferences could be drawn with reference to "an accused." Little discussion is needed to demonstrate that prior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct, unless it be under a "birds of a feather" theory of justice. Guilt, however, cannot be inferred merely by association. In any event, we conclude that the prejudice engendered by the admission into evidence of the prior acts of misconduct, even against Russell De-Cicco and Gregory Parness, the doers thereof, far outweighed its legitimate probative worth, and that therefore it was an abuse of discretion for the trial court to allow its admission though the admission of the testimony was accompanied by cautionary instructions to the jury.

■  Evidence of prior crimes is customarily not admissible to show the disposition, propensity or proclivity of an accused to commit the crime charged. Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892). See Michelson v. United States, 335 U.S.

469, 69 S.Ct. 213, 93 L.Ed. 168 (1948) and cases of this circuit, United States v. Smith, 283 F.2d 760, 763 (2 Cir. 1960), cert. denied, 365 U.S. 851, 81 S. Ct. 815, 5 L.Ed.2d 815 (1961); United States v. James, 208 F.2d 124 (2 Cir. 1953); United States v. Modern Reed & Rattan Co., Inc., 159 F.2d 656 (2 Cir.), cert. denied, 331 U.S. 831, 67 S.Ct. 1510, 91 L.Ed. 1845 (1947). Compare United States v. Apuzzo, 245 F.2d 416 (2 Cir.) (in banc), cert. denied, 355 U.S. 831, 78 S.Ct. 45, 2 L.Ed.2d 43 (1957). As stated in United States v. Smith:

> Such evidence is indeed not irrelevant; it is the kind of proof that in ordinary affairs we constantly use; we reason that, if a man has been guilty of unlawful or immoral conduct on other occasions, especially those that concern the same subject matter, there is an initial probability that he was guilty of the specific charge at bar. It is inadmissible, however, because it unduly confuses the decision of the issue on which the case must finally turn, and makes it likely that the jury may substitute the general moral obliquity of the accused. 283 F.2d at 763.

The rule which, despite the general rule, authorizes the admission into evidence of prior crimes similar in nature to the crime sought to be proved at trial authorizes it in order to prove knowledge, intent, or design. Therefore the evidence is compensatingly probative if the element of intent, etc. is placed in issue in the case at trial, either by the nature of the facts sought to be proved by the prosecution or the nature of the facts sought to be established by the defense. United States v. Smith, *supra*. In this case almost the entire defense was the attempted impeachment of the Government's principal witness, Paul Parness.[6]

6. On cross-examination the defense was able to mount a telling challenge to Paul Parness's credibility. As an informer for the FBI and other law enforcement agencies, Parness was paid on a "contingent fee" basis, the amount paid depending on the value of the information given. The defense elicited that here, prior to testifying, Paul Parness had telephoned his brother Gregory and had proposed to Gregory that, for $30,000, he would tell the Government that every-

The defendants did not admit stealing the art works and seek to avoid conviction on the narrow ground that they did not intend to transport the property in interstate commerce. Nor did any of the defendants claim to have been laboring under any misconception that the Hanley treasures were not stolen—which would have been an incredible claim, indeed! Nor did the Government's case raise any substantial issue as to whether any of the defendants knew what they were doing or whether they knew what they intended to do with the art treasures. Therefore, the defense's only hope in this case was to attack Paul Parness's credibility and thereby to raise a reasonable doubt about the veracity of his account of what the defendants did or said. This is not a case where, if one accepts Paul Parness's testimony at face value, the statements and acts of the defendants lead to equivocal inferences. Parness's story, if believed, leads ineluctably to the conclusion that the defendants knew what they were doing, for had any of the defendants admitted the facts testified to by Parness any claim that they were ignorant of the nature of the goods or their intended destination for sale to a prospective buyer would be patently incredible. Therefore, whatever probative value the prior crimes of DeCicco and Gregory Parness added to the prosecution's case on the issue of defendants' intent to commit the conspiracy here claimed was far outweighed by the unwarranted inference the jury was permitted to draw that the defendants, at least defendants DeCicco and Gregory Parness, were a continuing band of art treasure thieves and "fencers."

The Government seeks to justify the admission of this prior misconduct evidence on yet another ground, that of obviating in advance the defense of entrapment. We are not impressed by this contention. The evidence of DeCicco's and Gregory Parness's prior "use" of Paul Parness to dispose of stolen property was introduced during the Government's direct case before any issue of entrapment was delineated by the defense. Cf. United States v. Modern Reed & Rattan Co., Inc., *supra* 159 F.2d at 658. Furthermore, the facts of this case do not permit the issue of entrapment. Even if the Government had put in this testimony for this purpose in rebuttal we would view the evidence as a form of overkill since the defendants' claim of entrapment was defeated of its own weight. In short, the prejudice created by the introduction of collateral issues by Paul Parness's testimony overwhelmed whatever legitimate probative force it might have had in defending against an affirmative defense claim of entrapment. Moreover, the jury was not instructed to limit their consideration of such evidence to its applicability to an entrapment issue.

thing he had said to them were lies. At first, when questioned about this offer, Paul Parness denied making it, but, faced with a tape recording of the conversation with his brother, he changed his testimony and admitted he had first lied because "I didn't think they would tell you [defense attorney] about it" and because he thought he could get away with it. Also, on another occasion, Parness changed his testimony. He at first denied and then later admitted that he had told his mother that, after talking with a lawyer, he had found out he could get five to ten years for perjury. And again Parness, with candor, stated he had lied under oath because "I didn't think my mother or brother would be recording anything or tell you that I had been talking to them." The witness also admitted he had tried to influence his brother Gregory to testify for the Government in return for a large sum of money, and stated that he, on his part, had told authorities he expected to get $50,000 in return for his cooperation. Finally, Parness admitted that he had engaged in homosexual conduct for money; and had attempted to deal in pornographic literature by enticing young girls with liquor, marijuana, and pills to submit to being photographed. Apparently this last endeavor had not been accomplished. In short, the defense painted a convincing portrait of a man who would do or say just about anything if he could see a profit in it.

## II.

Appellant Gregory Parness claims that the August 30 meeting between his brother Paul, Louis Markus, and Russell DeCicco was post-conspiratorial, and, therefore, DeCicco's alleged account of the efforts to recover the paintings was a personal confession rather than a co-conspirator's verbal act admissible against all the defendants.

▇ As a declaration by DeCicco that the conspiracy existed, it is admissible against him and "those present who by their silence or other conduct assent to the truth of the declaration." Lutwak v. United States, 344 U.S. 604, 619, 73 S. Ct. 481, 490, 97 L.Ed. 593 (1953). Gregory, however, was not present at the August 30 get-together and if, in law, the conspiracy had by that date terminated, DeCicco's remarks to Paul Parness may not be used against defendant Gregory. *Id.* On remand of this case we caution the court to make a preliminary determination as to whether the defendants' alleged conspiracy terminated *prior to* the August 30 meeting. If so, and the Government insists upon using Paul Parness's testimony of what transpired on that date, it would be best to sever Gregory Parness's case from that of the other defendants for the words of DeCicco spoken on August 30 as they relate to Gregory are not admissible against Gregory. Cf. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). It would seem that on the evidence adduced below DeCicco, Markus, and Gregory Parness could well have come to the conclusion, at least after they had been stopped by the Pennsylvania State Police and had returned to New York State, that their criminal efforts had been thwarted, and because

the objectives of their conspiracy were unattainable their conspiracy had terminated.[7] However, determinations of this sort, dependent upon the development of the evidence at the new trial, must, of course, await that development.

## III.

Appellants Rene DeCicco, Gregory Parness, and Louis Markus contend that the Government's proof failed to establish their guilt.

The case against Rene was indeed weak, but we find that it was marginally sufficient to warrant submission of her guilt or innocence to the jury. The jury could have found that her conversation with Paul Parness relative to plans to dispose of the art works and her coded telephone conversation to her husband when she notified him to delay his return with the paintings to Buffalo established beyond a reasonable doubt that she was a member of the conspiracy and was actively participating in advancing the objectives of the conspiracy.

As for the other defendants, the Government's evidence demonstrates that their arguments under this point are without merit.

## IV.

Appellant Louis Markus contends that overt act No. 2, set out in the margin,[8] should have been excluded from consideration by the jury insofar as it related to him. The only evidence introduced at the trial that Markus was involved in the Hanley art collection burglary was agent Griffin's testimony that on August 21 he received a telephone call from Paul Parness, who advised him that Russell DeCicco and a man named

7. Parness testified that Russell DeCicco had told him on August 30 that "he was quite sure Mr. Burke was the one who had set him up and notified the police." And again Parness related that on that day DeCicco had said that "if he ever found out who set him up * * *." This would lead us to believe that De-Cicco and those present when he made the comments were aware that their well-laid

plans to recover the stolen objects could not be carried out.

8. Overt act 2 reads:
   On or about August 21, 1968, Russell DeCicco and Louis Markus burglarized the home of Dr. T. Edward Hanley in Bradford, Pennsylvania, of numerous paintings and statues valued in excess of one million dollars ($1,000,000).

"Louis" committed a burglary in Bradford, Pennsylvania. Upon the retrial it may be that the Government can introduce other evidence to strengthen its proof that Markus was a companion of DeCicco when the Hanley home was burglarized. In any event, the posture of the evidence on that point at the new trial will be considered by the trial court and relevant disposition of the issue then made.

### V.

We view all of the appellants' other contentions to be without merit.

Reversed and remanded.

LUMBARD, Chief Judge (concurring):

I agree that the admission of the testimony that Russell DeCicco and Gregory Parness had previously indulged in activity involving stolen art works was egregious error requiring reversal of the convictions.

The rule regarding the admission of evidence of similar crimes can be simply stated. Such evidence, because of its highly prejudicial nature, is not admissible until the defendant has raised the issues of motive or intent. United States v. Smith, 283 F.2d 760, 763 (2d Cir. 1960). Entrapment is one of the additional special exceptions to the rule of inadmissibility of similar crimes. Vol. No. 29, Am.Jur. Evidence, § 321, at 370 (1970). See also, United States v. Stocker, 273 F.2d 754 (7th Cir. 1960); United States v. Bishop, 367 F.2d 806 (2d Cir. 1966).

Agent Griffin's testimony that in nine months prior to August 1968 he had participated in recovering approximately half a million dollars in paintings, art objects and other goods "which were being fenced by Russell DeCicco and Gregory Parness" was highly prejudicial and it was not relevant to the issues before the jury when it was admitted.[1]

In the instant case the defense of entrapment was never really raised. The defendants did not take the stand; nor did they offer any evidence. All that happened was that on cross examination of Paul Parness, counsel for Gregory Parness asked whether he was trying to "trap" his brother. To this Paul Parness answered "No." And there the subject of entrapment rested. Thus there was no attempt to develop any evidence of entrapment. It is true that the trial judge instructed the jury on this issue and that counsel referred to it in their closing argument. However, the question was not squarely presented because of the absence of evidence. It was error to receive the evidence of similar crimes before the issue was squarely presented by some evidence.

As Lord Sumner suggested in Thompson v. The King (1918), App.C. 21, 232 "Before an issue can be raised so obviously prejudicial to the accused, it must be raised in substance if not in so many words, and the issue so raised must be one to which the prejudicial evidence is relevant. The mere theory that a plea of not guilty puts everything material in issue is not enough for this purpose. The prosecution cannot credit the accused with fancy defenses in order to rebut them at the outset with some damning piece of prejudice." McCormick on Evidence, § 157, at 331 (1 Ed.1954).

It was also error to permit Agent Connors to testify, on direct examination by the government, that he had been in contact with John Burke "during the investigation of another matter involving the robbery of a coin collector * * *." It is the duty of government counsel to instruct witnesses not to state such matter in their direct testimony and not to do so until they are asked an explicit question which calls for such information. It was unnecessarily prejudicial to describe Burke, the man with whom the defendants dealt in concealing

1. It is worth noting that this testimony was conclusory hearsay testimony at best and objectionable on that additional ground.

the fruits of the robbery, in such lurid colors.

I agree with Judge Waterman that before admitting testimony regarding the meeting of August 30, 1968 the trial judge should determine whether the conspiracy had terminated by that time because the effort to transfer the pictures the previous day had been aborted. If the judge finds that the conspiracy had ended, then the evidence is admissible only against Russell DeCicco. On application for a severance the other defendants would then have the right to be tried separately from Russell DeCicco, unless the government agrees not to use this evidence at a joint trial.

The case against Rene DeCicco was, in my opinion, sufficient to submit to the jury. Her telephone call and her presence when a threat was made to "burn" the informer could be found to indicate sufficient knowledge about the conspiracy and interest in its success to support a conviction.

As for Louis Markus' complaint about the sufficiency of the evidence regarding his participation in overt act number 2, it is entirely discretionary with the trial judge whether he comments on the participation of a particular defendant in one of seven overt acts. This is particularly so where there is abundant evidence that one or more defendants committed all of the overt acts alleged in the indictment. It is enough if the jury finds that there was a conspiracy or agreement and that one or more of the persons found to be a member or members of the conspiracy did any act to effect the object of the conspiracy. 18 U. S.C. § 371.

There was abundant evidence that Markus was actively engaged in the conspiracy. It would be unfortunate if, what was said in the court's opinion, were taken to indicate that, upon retrial, the trial judge was required to comment on so insignificant an item which was not determinative of the sufficiency of the evidence against Markus.

There was no error in the court's refusal to turn over to the defense material gathered from a New York State Police wiretap of Paul Parness' telephone. There is no reason to believe that the federal agents knew of or had any connection with such wiretaps at the time. The court did examine the taps for exculpatory information and made a substantial portion of the tap material available to defense counsel before the trial. It was entirley proper for the court to refuse to order disclosure of all of the tap information since the taps included evidence of criminal activity which was under continuing investigation by the state police.