**UNITED STATES of America, Plaintiff,**

v.

**David WENGER, Defendant.**

**No. 69 Cr. 569.**

United States District Court, S. D. New York.

Dec. 18, 1970.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., by Walter M. Phillips, Jr., New York City, of counsel for plaintiff.

Irving Anolik, New York City, for defendant.

## OPINION

POLLACK, District Judge.

Post-trial motions are made by the defendant David Wenger for an order pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure to set aside the jury verdict of guilty returned against said defendant on November 12, 1970 and to enter a judgment of acquittal, or in the alternative to set aside said verdict and grant a new trial on the basis of newly discovered evidence and in the interests of justice. Said defendant as a representative of an employee welfare trust fund was convicted of conspiring to receive a kickback and of agreeing to receive an improper payment in violation of 18 U.S.C. §§ 371 and 1954.

The case went to trial against 11 defendants. The indictment against one of the defendants was dismissed at the close of the government's case and the jury returned a verdict of not guilty as to eight of the defendants and a verdict of guilty as to the defendants David Wenger and John Keilly. Neither of said defendants has been sentenced.

The indictment charged that the defendants had conspired to receive a kickback in connection with a mortgage loan on property of the Mid-City Development Company in Detroit, Michigan. The loan application was made to the Central States, Southeast and Southwest Areas Pension Fund, a pension plan subject to the Welfare and Pension Plans Disclosure Act. The defendant John Keilly acted as the mortgage broker and the defendant David Wenger was the accountant for the Pension Fund. The defendants were charged with acting in conspiracy, in 1964, intentionally, knowingly and unlawfully. A loan was made to Mid-City by the Pension Fund, but no payoff followed due to circumstances explained in the evidence.

These motions are based on the testimony of an attorney, one John Townsend, who was produced as a rebuttal witness, and what the defendant characterizes as newly discovered evidence.

The defendant John Keilly took the witness stand and denied that he had met or conspired in 1964 with the defendant Wenger as charged by the government and testified specifically that he had never met Wenger until early 1966 or possibly December 1965.

Mr. Townsend as the government's witness in rebuttal, testified to a meet-

ing which took place in his office in Dallas, Texas in late October or early November 1963 which was attended by the defendants Wenger and Keilly and one Herbert Itkin, and others. He said that the purpose of the meeting was to discuss a mortgage loan requested by Townsend's client, Park View Hospital, located in Midland, Texas. The proposed loan was to be secured from the same welfare fund, the Central States Southeast and Southwest Areas Pension Fund. Townsend testified that Keilly introduced him to Wenger as being a member of the loan committee who was an auditor, stating that Wenger would check over the information in the loan application to see if all the figures were correct and were the necessary figures. He testified that the meeting lasted for about an hour and a half and that both Keilly and Wenger were there the entire time. The government then asked, over objection of the defendants

Q. Mr. Townsend, was Mr. Wenger ever mentioned by Mr. Keilly in connection with the fee in this case?

A. Yes. We were told that he would receive a point as well as Mr. Webb.

Townsend testified further along these lines that the parties present discussed the payment of a 10% fee for obtaining the loan which would be divided approximately as follows: 1% would go to the secretary of the Fund for processing the loan; and a percent would go to each one of the loan committee, of which there were approximately five or six, two of whom were present in Townsend's office at that time, Mr. Wenger and Mr. Webb; and that the other percents would be broken down to those who would be involved in helping the mortgage applicant to obtain the loan. This explanation of the fee division was made by Mr. Itkin in the presence of the others.

The attorney for Wenger cross-examined Townsend on the legality of the payments to obtain the loan and elicited the response that the witness felt that the fees were perfectly proper

and legal; that he knew of no impropriety either then or now.

Q. In other words, everything that happened there was perfectly legal, is that not so?

A. That is right.

[The government did not take issue with this interpretation].

Thereafter, on application of all of the defendants on trial including the defendant Wenger, the Court instructed the jury that the Townsend testimony was received and could be considered only as impeachment of the defendant Keilly and could not be considered by the jury as evidence against defendant Wenger or any other defendant. The defendant Wenger's attorney wrote out as a "Supplemental Request to Charge of Defendant Wenger" the precise words of the proposed limiting instruction to the jury and the Court then included this in its charge to the jury in *haec verba*.

Wenger concedes that the government could properly impeach Keilly's credibility, but maintains that for this purpose it could only show that Keilly and Wenger had met prior to December 1965 or 1966—nothing more. Wenger here contends that the testimony elicited by the government as to similar criminal conduct was prejudicial error as to Wenger, who had not taken the stand, and that the Court's limiting instruction even though given upon the request of the defendants and in the form supplied by the defendant Wenger did not cure the alleged error.

■ The government contends that the testimony was admissible and proper on each of two grounds: (1) as evidence of a prior similar act on the question of either intent or common scheme and design; (2) as impeachment of Keilly as to when he first knew Wenger.

The use and effect of the evidence are, understandably, exaggerated by the moving party.

The government argues that the rule is well-established that proof of similar criminal conduct may be introduced to show a continuing plan, system or design

by a defendant. It says that in the present case Townsend's testimony clearly established a scheme of similar criminal action. The Park View Hospital and Mid-City mortgage negotiations occurred within months of each other; they both involved escrow agreements which contained almost exactly identical language; each involved Herbert Itkin as the escrow agent; and each involved a loan from the same Pension Fund. The government says that under these circumstances Townsend's testimony was admissible against both Keilly and Wenger to prove the conspiracy charged and the criminal intent of the conduct of the defendant Wenger as charged herein.

Finally, the government says that the Court's cautionary instruction to the jury limiting the use of Townsend's testimony was more favorable than defendant was entitled to and was entirely sufficient if the evidence was to be received only for impeachment purposes.

The Second Circuit has recently dealt with the problem of similar criminal acts in the case of United States v. DeCicco, 435 F.2d 478 (2d Cir. 1970) (Waterman, J.). In that case evidence of prior similar acts, theft and sale of stolen art objects, was admitted with a cautionary instruction by the Court that it was to be considered only on the question of the defendant's specific intent. The Court of Appeals reversed a conviction on the ground that the prejudice engendered by the admission of the similar acts far outweighed their legitimate probative worth so that it was an abuse of discretion to allow such evidence even with a cautionary instruction. The Court noted that:

Evidence of prior crimes is customarily not admissible to show the disposition, propensity or proclivity of an accused to commit the crime charged.

The Court further went on to enunciate the test to be used in such cases as follows:

* * * the evidence is compensatingly probative if the element of intent, etc. is placed in issue in the case at trial, either by the nature of the facts sought to be proved by the prosecution or the nature of the facts sought to be established by the defense.

Lumbard, C. J., concurring, took an even more restrictive view, stating that:

Such evidence [of similar crimes], because of its highly prejudicial nature, is not admissible until the defendant has raised the issues of motive or intent.

In this case, the conspiracy count as well as the substantive count clearly raised the issue of the motive and intent of defendant and the evidence indicated a course of conduct reasonably contemporaneous with the acts charged herein.

In United States v. Deaton, 381 F.2d 114 (2d Cir. 1967) where the primary issue at the trial was the appellant's intent as to the availability of a loan, he had ostensibly committed the Company to make a loan, he had pocketed or attempted to pocket the commitment fee paid to him in advance, but no loan was ever made as agreed. The government introduced evidence of three similar transactions and the appellant contended, unsuccessfully, on appeal that the three transactions were not admissible because they were not acts for which he was charged in the indictment. The ruling on appeal was:

The court limited its use as evidence to the issue of intent and so instructed the jury at the time it overruled the objection and later in its charge. This was entirely correct and it committed no error in admitting the evidence. (p. 118).

It is settled doctrine in numerous decisions that the trial judge has a wide range of discretion in permitting such potentially prejudicial evidence. Where the probative value, of the evidence of other similar acts that indicate a course of conduct, outweighs its potentially prejudicial character, evidence of

similar acts, including other crimes, is admissible. *Cf.* United States v. Deaton, 381 F.2d 114, 117 (2d Cir. 1967); United States v. Byrd, 352 F.2d 570, 574 (2d Cir. 1965); United States v. Marquez, 332 F.2d 162, 166 (2d Cir.), cert. denied, 379 U.S. 890, 85 S.Ct. 162, 13 L.Ed.2d 94 (1964); United States v. Krulewitch, 145 F.2d 76, 80 (2d Cir. 1944); United States v. Crowe, 188 F.2d 209, 212 (7th Cir. 1951); Kowalchuk v. United States, 176 F.2d 873, 878 (6th Cir. 1949).

■ Even if the admission of the testimony was error and the taint was not sufficiently removed by the Court's limiting instructions given in the language and at the instance of the moving defendant, it must nonetheless be determined whether the error, if it was such, was so prejudicial as to constitute on the record before the Court a basis for a new trial i. e., whether the jury would have reached the same verdict beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

There was abundant evidence that Keilly and Wenger were engaged in the conspiracy and bribery charged. The challenged testimony went to an issue squarely presented by evidence, namely, Keilly's attempt to throw off his direct dealings in 1964 with Wenger as proved by the prosecution with testimony that until 1966 he had not met Wenger. The Townsend evidence showed that the two were together in Dallas, Texas; that they were business associates; that they were connected in mortgage matters relating to this same Pension Fund in 1963. Wenger sat by silently at the trial taking the benefit of Keilly's testimony that the two had not met until 1966. While not obliged to adduce evidence, the defendant Wenger was not entitled to benefit from false evidence where the government could show the truth.

At all events, in the opinion of the Court as the trial judge having heard all of the proof and seen the witnesses who were produced, the jury would have reached the same verdict beyond a reasonable doubt, without the questioned testimony.

■ The moving party refers to the acquittal of the eight co-defendants as indicative of the jury's disbelief of the Itkin testimony. Speculation on the jury's reasons for the acquittal would present an exercise in futility. The demonstrated participation of the eight was essentially to compel Itkin to repay money that he had received from Ciaffone (Mid-City) as he had promised to do and to relieve Itkin of the attack on his professional standing at the Bar Association's Grievance Committee. On the other hand, the defendant Keilly and the defendant Wenger participated on an entirely different footing in the case.

■ The material referred to by the defendant as newly discovered evidence consists of documents which allegedly show that Townsend was in error or falsifying about the date of the meeting with Keilly and Wenger in Dallas. The documents allegedly showed that there was a meeting in May 1964. This does not necessarily exclude an earlier encounter. The government contends that at best the documents show that the negotiations over the mortgage loan application were of a continuing nature and lasted through June 1964, but that they do not contradict Townsend's testimony.

Regardless of the interpretation to be placed on the documents, they are not sufficient to warrant a new trial. The new material does not tend to furnish evidence of the defendant's innocence and they are not such as would probably produce an acquittal. United States v. On Lee, 201 F.2d 722, 723–724 (2nd Cir.), cert. denied, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953).

The motions of the defendant Wenger are denied in all respects.

So ordered.