**UNITED STATES of America, Appellee,**

v.

**Anthony Edward ANZALONE and Angelo Rios, Appellants.**

Nos. 889, 890, Dockets 79–1424–25.

United States Court of Appeals, Second Circuit.

Argued March 19, 1980.

Decided June 26, 1980.

Guy Miller Struve, New York City, for appellant Anzalone.

Michael Corriero, New York City (Donald E. Nawi, New York City, of counsel), for appellant Rios.

Walter P. Loughlin, Asst. U. S. Atty., New York City (William M. Tendy, U. S. Atty., S. D. N. Y., Howard W. Goldstein, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, MULLIGAN and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Anthony Anzalone and Angel Rios appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after a jury trial before Lee P. Gagliardi, Judge. Both appellants were convicted under Count One charging them with a conspiracy to violate 18 U.S.C. §§ 472, 473, by possessing and dealing in counterfeit obligations of the United States, including $10 and $20 Federal Reserve notes and $1,000-face-value Dis-

trict of Columbia Armory Board bonds.[1] The remaining ten counts relate only to appellant Anzalone on this appeal and alternately charged him with § 472 and § 473 counterfeiting violations pertaining to $1,000 and $10 Federal Reserve notes (Counts Two and Three), two $1,000 District of Columbia Armory Board bonds (Counts Four and Five), two additional $1,000 D.C. Armory Board bonds (Counts Six and Seven), one $20 Federal Reserve note (Counts Eight and Nine), and 978 additional D.C. Armory Board bonds (Counts Ten and Eleven). Anzalone was found guilty on all counts.

Anzalone's principal arguments here are (1) that the D.C. Armory Board bonds were not obligations or other securities of the United States under the statute,[2] (2) that the bonds were not counterfeits because they were insufficiently complete or obviously spurious, and (3) that, in distributing some of the bonds, as well as the counterfeit $20 bill, he lacked the requisite intent because the items exchanged were only "samples." We reverse Anzalone's conviction on all substantive counts relating to the bonds, because we agree that the statute does not apply to them. We uphold his conviction on Counts Two and Three, Eight and Nine, as we reject his argument concerning the "sample" $20 bill, as well as his further argument that the trial judge should have granted his motion for a mistrial. We uphold the convictions on the conspiracy count for reasons that will appear below.[3]

The Government amply proved that in July 1979 appellant Anzalone possessed and dealt in counterfeit currency and in counterfeit D.C. Armory Board bonds. On July 2, 1979, a Secret Service informant at the New York Secret Service Field Office telephoned appellant Rios at Angel's Place, a bar Rios operated. The informant posed as a broker for a "Cuban guy" named "John" who wanted to purchase $1,000 in counterfeit currency. During the telephone call Rios talked with Anzalone, who was present, and told the informant to come with "John" to "Tony's Store" and to bring $400 in genuine currency as a payment for the $1,000 in counterfeit money. When Rios insisted that the $400 would have to be paid to Anzalone "up front" so as to enable Anzalone to purchase the counterfeit money, the informant balked. A short time later, Anzalone spoke directly on the telephone with a Secret Service special agent, Ronald Malfi, who was posing as the informant's purchaser, "John." Anzalone then assured Malfi that it was safe to pay for the counterfeit currency "up front" because Rios, whom he described as his nephew, would "stand good for" the transaction.

1. Section 472 provides:

    Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

    Section 473 provides:

    Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

2. See note 1 supra. The definition of this term is found in 18 U.S.C. § 8:

    The term "obligation or other security of the United States" includes all bonds, certificates of indebtedness, national bank currency, Federal Reserve notes, Federal Reserve bank notes, coupons, United States notes, Treasury notes, gold certificates, silver certificates, fractional notes, certificates of deposit, bills, checks, or drafts for money, drawn by or upon authorized officers of the United States, stamps and other representatives of value, of whatever denomination, issued under any Act of Congress, and canceled United States stamps.

3. Anzalone was sentenced to a two-year term of imprisonment on Count One and to concurrent five-year terms on Counts Two through Eleven, with execution of all but six months of the five-year terms suspended and a fifty-four month period of probation to commence after serving the six months of the custodial time. Rios was sentenced to a two-year term in a community treatment house, with all but four months suspended, and a twenty-month period of probation.

The next morning, July 3, 1979, Malfi met Anzalone outside the latter's candy store and exchanged $400 in genuine currency for $1,000 in counterfeit $10 bills. Anzalone also asked Malfi whether he would be interested in purchasing up to $6 million worth of counterfeit District of Columbia bonds, and the latter said that he knew someone who would be interested but that he would first have to see a sample. Within ten minutes Anzalone came back with the two counterfeit D.C. Armory Board bonds, which were the subject of Counts Four and Five.

Three days later, on July 6, 1979, Malfi met again with Anzalone outside the candy store and at this point Malfi introduced Anzalone to Secret Service Special Agent Stewart Henry, who was posing as someone interested in purchasing the counterfeit bonds. During this discussion Anzalone gave Henry two more counterfeit bonds, the subjects of Counts Six and Seven. On July 10, 1979, Anzalone and Malfi met again, and Anzalone showed Malfi a counterfeit $20 bill. Malfi asked if he could have it as a sample, but Anzalone refused, saying that he had to show it to other customers.

Two days later Anzalone, Malfi, and Henry met yet again in Henry's car in front of Anzalone's candy store. Henry told Anzalone that he wanted to use $1 million worth of the D.C. Armory Board bonds as collateral to obtain a bank loan with the help of a dishonest loan officer. He proposed dividing the proceeds of the loan, which would be at least $250,000, provided that Anzalone would "freeze" the remaining $5 million worth of bonds while the loan application was pending. Anzalone wanted to think this over but said that he would need $5,000 "up front." Immediately following this discussion, Anzalone took Malfi to Anzalone's automobile where they talked about possible purchases of $10 and $20 bills. During this conversation, Anzalone took a counterfeit $20 bill from a tape deck in his auto and gave it to Malfi.

On July 16, 1979, Anzalone agreed to give Henry $1 million worth of counterfeit D.C. Armory Board bonds in exchange for a $5,000 cash payment up front and a $120,000 payment when Henry's loan was approved. He also agreed to "freeze" the remaining $5 million worth of bonds and to get $20,000 in counterfeit $20 bills for Malfi. In this conversation, which was tape recorded, Anzalone promised to deliver the bonds, with serial numbers printed on them, and the $20,000 package of counterfeit $20 bills the following day, July 17, 1979.

On that date, however, Anzalone told Malfi that he could not deliver the counterfeit currency, because he had not been able to contact his source, and refused to deliver the bonds until he had his $5,000 cash payment. After some discussion, Anzalone gave Henry an envelope containing a locker key, explaining that the bonds were in a locker in the Port Authority Bus Terminal in Manhattan corresponding to the numbered key. The Secret Service agents then went to the locker and found 978 D.C. Armory bonds, which were the subjects of Counts Ten and Eleven. As can be seen by the above account, Rios's only actions connected with the overall series of transactions were accepting the call from the Secret Service agent in reference to counterfeit currency and putting the agent on the telephone with his "uncle," Anzalone.

## DISCUSSION

Anzalone first contends that his convictions under Counts One, Four through Seven, and Ten and Eleven cannot stand because a District of Columbia Armory Board bond is not "an obligation or other security of the United States" as used in 18 U.S.C. §§ 472, 473 and defined in 18 U.S.C. § 8. See notes 1 and 2 supra. The question is one of statutory interpretation, with the usual rule of strict construction of criminal statutes applicable. Prussian v. United States, 282 U.S. 675, 677, 51 S.Ct. 223, 224, 75 L.Ed. 610 (1931); Gesell v. United States, 1 F.2d 283, 285–86 (8th Cir. 1924). All parties agree that the bonds are not included in the category of United States obligations merely because they were issued by a branch of the District of Columbia government. See, e. g., Sweeney v. United States,

285 F.2d 444, 447 (Ct.Cl.1961) (the United States is not obligated on the debts of the District of Columbia, unless Congress so decrees). Instead, the Government argues that these bonds fall under the statute, either because they were authorized by Congress or because they were guaranteed by the United States, or both.

To support this view, the Government first asserts that the definition of the term "obligation or other security of the United States," as set forth in 18 U.S.C. § 8, includes "all bonds . . . and other representatives of value, of whatever denomination, issued under any Act of Congress." Congressional authorization *is* arguably present here because the District of Columbia Armory Board was created by an act of Congress, D.C. Code § 2–1702, and because a specific provision authorized the Board to issue negotiable bonds at a rate approved by the Secretary of the Treasury, *id.* § 2–1722(a).

■ It is also clear that the bonds are guaranteed as to principal and interest by the United States. *Id.* § 2–1727. However, this second factor relied on by the Government, a factor noted by the district court in submitting the legal status of the bonds as an issue for the jury,[4] has no independent importance for us, because § 8 clearly does not include all contingent liabilities of the United States.[5]

■ Therefore we are left with the Government's other argument—that the statute must be construed to include *all* bonds authorized by *any* act of Congress. Parenthetically we note that this construction would apply the federal counterfeiting statutes to a host of bonds for which the Government is not liable, including, for example, those issued by "Federal land banks," 12 U.S.C. § 2012(10), federal "banks for cooperatives," 12 U.S.C. § 2122(10), and the Federal National Mortgage Association,

12 U.S.C. § 1719(b). More importantly, however, we do not think that 18 U.S.C. § 8 can be read to include "all bonds . . . issued under any Act of Congress." Rather, on its face, the statute appears to create three different categories—(1) bonds, certificates of indebtedness, currency, notes, Treasury notes, certificates of deposit, bills, checks, or drafts "drawn by or upon authorized officers of the United States"; (2) "stamps and other representatives of value, of whatever denomination, issued under any Act of Congress"; and (3) "canceled United States stamps." If so, then the statute covers only bonds on which the United States is directly obligated.

The legislative history supports this reading. The original enactment from which §§ 472 and 473 derive, Act of June 30, 1864, ch. 172, § 10, 13 Stat. 218, was part of a statute that authorized the issuance of $400 million in bonds and Treasury notes, $150 million in certificates of deposit, and $50 million in fractional notes to help defray the costs of the Civil War. *Id.* §§ 1–5. The first section of the statute exempted from state and municipal taxation "all bonds, treasury notes, and other obligations of the United States." *Id.* § 1. Discussing this section, the floor manager of the statute in the House, Representative Hooper, stated, "I understand, however, that this provision applies only to the interest bearing obligations of the Government." Cong. Globe, 38th Cong., 1st Sess. 3183 (June 22, 1864). This section, which has now become 31 U.S.C. § 742, has been held by the Supreme Court, in the light of Representative Hooper's statement, to immunize from state and municipal taxation "only the interest-bearing obligations of the United States which are needed to secure credit to carry on the necessary functions of government." *Smith v. Davis,* 323 U.S. 111, 119, 65 S.Ct. 157, 161, 89 L.Ed. 107 (1944) (applying *ejusdem generis* rule).[6] We see no reason why

---

4. The question whether the bonds fell under the statute was one of law for the district court to decide, not one of fact for the jury.

5. The Government has pointed to no case under the statute considering a guaranty sufficient to create an obligation of the United States. *See* note 6 *infra.*

6. It has also been held, following *Smith,* that an obligation guaranteed by the United States is not an "obligation of the United States" within

obligations of the United States should be defined differently for present purposes.

Indeed, Congress itself seems to have accepted this definition. Numerous provisions dealing with counterfeit obligations of the Reconstruction Finance Corporation, the Home Owners' Loan Corporation, and other entities, which have now been consolidated into 18 U.S.C. § 493, would all have been unnecessary if the Government's interpretation of 18 U.S.C. § 8 were the proper one.

Thus, based on a fair reading of the words of the statute, the limited legislative history, the interpretation given the statute by Congress, and the apparent novelty of the Government's claim, we conclude that the District of Columbia Armory Board bonds here involved were not obligations or other securities of the United States. As a result, Anzalone's convictions on Counts Four through Seven and Ten and Eleven, based solely on bond transactions, clearly must be reversed.[7]

■ Appellant Anzalone also argues, with respect to the $20 bill referred to in Counts Eight and Nine, that it was intended only as a sample for examination and not intended to be passed to any third parties. He thus contends that there was a failure to establish intent required under 18 U.S.C. §§ 472, 473. Section 472 requires a showing of intent to defraud while Section

473 requires a showing of intent to pass the obligations as genuine, and it has been held that the requisite intent under these sections is lacking as a matter of law in a case where counterfeit obligations are given solely as samples for examination. *United States v. Wilkerson*, 469 F.2d 963, 969 (5th Cir. 1972), *cert. denied*, 410 U.S. 986, 93 S.Ct. 1515, 36 L.Ed.2d 184 (1973) (§§ 472, 473 prosecution); *United States v. Goodwin*, 455 F.2d 710, 713 (10th Cir.), *cert. denied*, 409 U.S. 859, 93 S.Ct. 146, 34 L.Ed.2d 105 (1972) (§ 473 prosecution). But in both of these cases, the courts attached particular significance to the fact that the undercover agents and the defendants had a specific understanding that the counterfeit samples were to be *returned* to the defendants and not distributed. And *United States v. Wilkerson* points out that it is clear that only a general intent that some innocent third party in the chain of distribution be defrauded is required. 469 F.2d at 969. Thus, even where the evidence demonstrates that a sample counterfeit note is transferred for the specific purpose of displaying it to potential purchasers, the requisite intent to defraud is established if the jury can infer "that thereafter the bills would be passed as true and genuine." *Hart v. United States*, 396 F.2d 243, 245–46 (8th Cir. 1968), *cert. denied*, 393 U.S. 1033 (1969).[8]

the meaning of 31 U.S.C. § 742. *S.S. Silberblatt, Inc. v. Tax Commission*, 5 N.Y.2d 635, 641, 159 N.E.2d 195, 197–98, 186 N.Y.S.2d 646, 650, *cert. denied*, 361 U.S. 912, 80 S.Ct. 253, 4 L.Ed.2d 183 (1959) (device employed here not a pledge of credit "in the usual sense," but merely a guaranty of private mortgage payments).

This court has also decided under § 103(a) of the Internal Revenue Code, 26 U.S.C. § 103(a), which exempts from federal income taxation interest on "the obligations of a State . . . or any political subdivision," that interest on student loans guaranteed by the State of New York is not exempt from taxation because such loans are not obligations of the State of New York. *State Bank of Albany v. United States*, 389 F.2d 85, 85–86 (2d Cir. 1968) (per curiam).

**7.** In view of this holding, we need not reach Anzalone's claims that the bonds were copied too poorly or incompletely to constitute "counterfeits," or that some of the bonds were only

exchanged as "samples." We do not feel that Anzalone's substantive currency convictions were in any way tainted by the Government's error with respect to the bonds.

**8.** In *United States v. Castens*, 462 F.2d 391 (8th Cir. 1972), a prosecution under § 473, the appellant had sent some counterfeit bills to a friend with instructions to hide them until his return. Relying on *Hart*, the court seemed willing to allow a jury to infer intent to pass the bills as genuine when "all the circumstances indicate that appellant either intended to pass the bills himself upon his return . . . or intended that his friend . . . pass them for him under his direction after he returned." We need not decide whether to adopt this broad rule, allowing a conviction even if return of the bills to the transferor was intended, because there was no agreement to return the samples in the present case.

In the instant case, taking the evidence in the light most favorable to the Government, Anzalone gave Agent Malfi the counterfeit $20 bill as a sample so that he could show it to other potential customers, but it was understood that Malfi would keep the bill to use as he saw fit. If and when he ultimately made a purchase of other $20 bills, Malfi was certainly not prevented by his understanding with Anzalone from putting the original sample bill into general circulation as well. We therefore conclude that the record is sufficient under the foregoing cases to support the jury's finding of the requisite intent.

Anzalone argues that he was entitled to a mistrial declaration because of one sentence contained in a tape-recorded conversation that was introduced in evidence and played to the jury. He also contends that the trial court should have declared a mistrial when Agent Malfi testified that at one of their meetings, Anzalone had shown him photographs of what Anzalone described as "stolen Rubens paintings."

The tape-recorded conversation was one of four introduced in the trial, copies of which were furnished to Anzalone's counsel five weeks before trial. Rough drafts of the transcripts of these tapes were offered to him one week before trial. The final transcripts were mailed to him five days before any tape was offered in evidence and received by him at least two days before the tape in question here was played at trial. Anzalone's counsel referred only to putting the Government on notice not to play references in the tapes to Anzalone's "prior record in the nature of 'I have had this happen before.' "[9] The crucial portion of the tape that was played is where Anzalone said:

Your deal, you see, wait, let me put something [unintelligible]. People around here and people that I deal with mostly with everything, they want to see the money up front. You don't want to let go of the money until you get the merchandise. See the first thing comes in goes to the *people around here, like myself, they have done time.* Agents work this way. And this is the first thing that pops into their minds, and they get paranoid.

(Emphasis supplied.) No objection was made when the tape recording or the transcript of the conversation was offered into evidence, but after the tape was played, Anzalone's counsel moved for a mistrial. The court offered to give a curative instruction, but defense counsel declined the offer. The district court denied the mistrial motion, making the specific finding that any prejudice would be harmless. We agree. Because the failure to redact the recorded statement was inadvertent, no specific objections were made in advance, the statement was not altogether clear, and there was nothing to draw the jury's particular attention to it (occurring as it did in the middle of a one-and-a-half hour tape), and in light of the overwhelming proof presented, the admission of this statement into evidence was harmless error.

As for the reference to "stolen Rubens paintings," Anzalone's trial counsel in his opening statement referred to the agents as having "to press people into selling them money" and suggested an entrapment defense by saying that "you will have to decide whether what he did here or what they got him to do or tried to get him to do, whether it constitutes an intentional, know-

9. The Government accordingly redacted the italicized portion of one tape as follows:

> ANZALONE: From our conversations, I understand you can't, but I'm just trying to get myself to go alone with it, and, uh, this is one of my problems. You see, you ever hear of like, a woman's, uh, falls asleep and wakes up in the morning and (UI) she says *don't go out there because you'll trip under a ladder or down the stairs or something—ay, any fuckin' thing.*

> SA HENRY: He what are you, have some premonitions or something?
> ANZALONE: Yeah, yeah.
> SA HENRY: Voodoo. It's voodoo.
> ANZALONE: Yeah, it's something like I call it bad vibes. *Every time I got it, I used to go to jail.*
> (Emphasis added.)

ing, willful crime . . . or whether he was, as I say, just some poor schlep . . who was pressed to do things, but not enough to constitute a crime." If this statement was sufficient to raise an entrapment defense, then proof relating to Anzalone's predisposition was admissible. *United States v. Cohen*, 489 F.2d 945, 950 (2d Cir. 1973); *United States v. Bishop*, 367 F.2d 806, 809 n. 5 (2d Cir. 1966). *But cf. United States v. DeCicco*, 435 F.2d 478, 486 (2d Cir. 1970) (Lumbard, J., concurring) (where no *evidence* was presented in support of entrapment defense, it was improper for Government to elicit evidence of predisposition). While possessing stolen Rubens paintings and counterfeiting are not exactly the same form of criminal conduct, the former act can be used to show predisposition because these two crimes are "morally indistinguishable" and "of the same kind" within *United States v. Viviano*, 437 F.2d 295, 299 n. 3 (2d Cir.), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971) (citing *United States v. Becker*, 62 F.2d 1007, 1009 (2d Cir. 1933)). We also note that after Anzalone's counsel objected, the court instructed the jury to disregard the testimony. In sum, we cannot hold that the denial of Anzalone's mistrial motion was an abuse of discretion.[10]

■ There remains a question, not briefed by the parties, whether the reversal of the convictions on the substantive bond counts vitiates the convictions on the conspiracy count. That count charged a four-person conspiracy to violate 18 U.S.C. §§ 472–473, stating that it

> was part of said conspiracy that the said defendants . . . pass . . . counterfeited and altered obligations and securities of the United States, to wit, ten dollar ($10.00) Federal Reserve Notes, twenty dollar ($20.00) Federal Reserve Notes, and District of Columbia Armory Board Bonds (each bond bearing a face value of $1,000).

In the light of our decision on the bond counts, the first question is whether Anzalone and Rios would have been convicted of a properly described conspiracy to violate the statute by counterfeiting *only* currency. We note that Anzalone was convicted on four substantive counts involving currency and that the evidence concerning Rios, as well as Cruz, the third convicted coconspirator, involved *only* currency.

In our view the jury necessarily would have found Anzalone and Rios guilty of a narrower, currency-related conspiracy. It evidently believed that Rios did make the phone call for Anzalone and that he was a knowing participant in a larger Anzalone-centered conspiracy. It is apparent from the tape recording of the conversation between the informant, Medina, and Rios that the scheme involved more than the sale of counterfeit $10 bills. Rios discussed a prior meeting that did not occur as planned and the possibility of arranging future purchases of $20,000 to $30,000 of counterfeit currency. Rios then put Anzalone on the phone with Medina and agent Malfi and they discussed the problem of having money "in front" for "this particular merchandise" as well as "other merchandise." Rios had already stated to Medina that he "would be responsible" for any money paid "up front." In sum, there was ample evidence to link Rios, a broker, negotiator and financial guarantor from the beginning, to the larger conspiracy charged here, and that evidence is all also probative of his participation in a narrower currency conspiracy. We are convinced that both appellants would have been convicted of such a conspiracy.

■ The question then becomes whether the description of the conspiracy so as to include the passing of counterfeited bonds was unduly prejudicial to either or both of the appellants. Even though none of the evidence linking Rios to Anzalone involved bonds, we see no reason why we should find "prejudicial spillover" from the evidence concerning the bonds. *See United States v. Cambindo*, 609 F.2d 603, 626–27, 629 (2d Cir.

---

10. We reject as frivolous the claim that the court committed plain error in failing to charge the jury that the *currency* exchanged must be realistic enough to "deceive an honest, sensible, and unsuspecting person of ordinary observation and care."

1979). We have already concluded that the bond evidence did not taint Anzalone's convictions on the currency counts. It is equally unlikely that the bond evidence interfered with the jury's fair consideration of the evidence of a currency conspiracy between Rios and Anzalone.

Appellant Rios's other claim is that his trial should have been severed, in accordance with his timely motion under Fed. R.Crim.P. 14. Under our decisions this question was in the sound discretion of the trial court, *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir.) *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), and for the reasons just stated in our discussion of the evidence against Rios, we do not think that discretion was abused. *See United States v. Sotomayor*, 592 F.2d 1219, 1227–28 (2d Cir.), *cert. denied*, 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979).

Judgments of conviction on Counts Four through Seven, Ten and Eleven reversed; judgments of conviction on Counts One, Two, Three, Eight and Nine affirmed.