**UNITED STATES of America,**
**Appellee,**

v.

**John F. BISHOP, Appellant.**

**No. 103, Docket 30229.**

United States Court of Appeals
Second Circuit.

Argued Sept. 30, 1966.

Decided Oct. 26, 1966.

James A. Fowler, Jr., New York City (Anthony F. Marra, New York City, on the brief), for appellant.

Donald F. McCaffrey, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty., for the E. D. New York, on the brief), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge.

This appeal raises troublesome issues in an area of the criminal law under constant review—the entrapment defense. John Bishop was found by a jury to be guilty of 6 counts of possession, sale and delivery of counterfeit money, and 1 count of conspiracy.[1] He received a sentence of 5 years on each of the 7 counts, to run concurrently. We affirm his conviction.

### I.

During the winter of 1964–65, a great many counterfeit bills appeared in the downtown business area of Brooklyn. One James Jackson was arrested by Secret Service agents on January 9, 1965 when he passed a counterfeit bill in Mays Department Store. Concerned over two felony charges already pending against him, Jackson readily agreed to cooperate with the agents in their efforts to apprehend "Cadillac Bobby," a reputed trafficker in counterfeit money, and other associates.

During the next 3 weeks Jackson unsuccessfully tried to put the agents in contact with "Cadillac Bobby," and toward the end of the month it was decided to abandon these efforts and to concentrate instead on the other individuals who were involved in the counterfeiting. On January 29, Jackson arranged a meeting at the Club Coronet between a friend of his, Ernest Duncan, and undercover agent Jesse Spratley, who was introduced to Duncan only as "Bobby." Duncan, who was unaware that Jackson had become an informer, took Spratley and Jackson to the Random Billiard Hall where they met Tyrone Thompson. Agent Spratley, still posing as "Bobby," told Thompson that he wished to buy $1000 of counterfeit money. The 4 men left the billiard parlor and proceeded by taxi to 932 Myrtle Avenue to meet Thompson's "connection." While the others remained outside, Thompson led Spratley to the third floor of the building and instructed him to remain there while he went up the stairs. At this point in the sequence of events there is some confusion as to what exactly occurred, for 10 or 15 minutes later Thompson called to Spratley from the floor *below*. The prosecutor argued in his summation that Thompson had gone over the roof from 932 Myrtle Avenue to No. 928, the building where Bishop lived, arranged a meeting, left No. 928 and walked back to No. 932 via the street. When he returned, Thompson told Spratley that his "connection" was not at home, and then pointing to a black Buick bearing New York license plate KD 6570, stated that it belonged to his "connec-

---

1. The jury found that Bishop violated 18 U.S.C. § 472 (uttering counterfeit obligations or securities); § 473 (dealing in counterfeit obligations or securities); and § 371 (conspiracy to commit offense or to defraud the United States). Co-defendant Thompson was also convicted on all 7 counts, while co-defendant Duncan was convicted only on the conspiracy count.

tion." The car was registered in the name of John Bishop, residing at 928 Myrtle Avenue.

At 9:00 P.M. that same day, Spratley and Jackson returned to the billiard hall to meet Thompson, and at his direction the 3 men went by taxi to the Elks Bar. Close to this location, Thompson left the taxi, informing the other two to remain inside it because he would soon return. Several minutes later he emerged from the bar with Bishop, and remained in sight for a few moments. Soon they reentered the bar only to reappear once again at the door. At that time Jackson saw something pass from Bishop to Thompson; Spratley, however, saw nothing. Leaving the Elks Bar, Thompson returned to the parked cab and sold Spratley 96 counterfeit $10 bills for $250. Spratley asked if he could buy another $5000 in the future, and Thompson replied that the matter would have to be discussed with his contact. Thompson then left Jackson and Spratley and drove off with Bishop in the latter's black Buick.

The second "buy" was arranged on February 5, 1965. This time the government established a "stake-out" with 2 surveillance units at the Elks Bar. Spratley, along with special agent Joseph Gasquez, picked up informer Jackson and proceeded to the billiard hall where they met Thompson. The 4 men then drove along Washington Street and parked around the corner from the Elks Bar. Thompson left the car and walked in the direction of the bar. After a few preliminaries he returned and told Spratley to accompany him so that he could talk to "his man." Near the entrance of the Elks Bar, the 2 men met Bishop, who handed Spratley a stack of 51 counterfeit $10 bills. The agent returned to the car "to inspect" the money, at which point Gasquez signaled to the other agents who moved in and arrested Thompson and Bishop.

With this distilled version of the evidence particularly relevant to the points raised on this appeal, we approach our discussion of the law.

## II.

The defense of entrapment was given extensive review and consideration in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932),[2] where the Supreme Court stated:

> [T]he defense * * * is not simply that the particular act was committed at the instance of government officials. * * * [T]he issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the Government

2. The eight Justices who voted to sustain the defense of entrapment in *Sorrells* reached that result by two different routes. Mr. Chief Justice Hughes, writing for the majority, believed that the defendant was not guilty of violating the statute because "its application in the circumstances * * * is foreign to its purpose * * * [and] shocking to the sense of justice." 287 U.S. at 446, 53 S. Ct. at 214. "The defense is available, not in the view that the accused though guilty may go free, but that the Government cannot be permitted to contend that he is guilty of a crime where the government officials are the instigators of his conduct." Id. at 452, 53 S.Ct. at 216. Mr. Justice Roberts, on the other hand, writing for himself and Justices Brandeis and Stone, found the defense of entrapment "attributes no merit to a guilty defendant," id. at 455, 53 S.Ct. at 217; rather it is based on the Court's power to pre-

serve "the purity of its own temple." Id. at 457, 53 S.Ct. at 218.

When the Supreme Court again examined entrapment in Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), it split along similar lines. The majority refused to re-examine the doctrine of *Sorrells*, 356 U.S. at 376–378, 78 S.Ct. 819, while four Justices, speaking through Mr. Justice Frankfurter, agreed substantially with the views of Mr. Justice Roberts. Id. at 378–380, 78 S.Ct. 819.

One police official has explained the rationale behind the defense of entrapment quite simply: "In short, officers are paid to catch criminals and not to create them." J. Williams, "Entrapment—A Legal Limitation on Police Techniques," 48 Journal of Criminal Law, Criminology and Police Science, 343, 348 (1957).

is seeking to punish for an alleged offense which is the product of its own officials. 287 U.S. at 451, 53 S.Ct. at 216.

■ The defense of entrapment presents, as Judge Learned Hand indicated, two distinct issues: "(1) did the agent induce the accused to commit the offense charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense." United States v. Sherman, 200 F.2d 880, 882 (2d Cir.1952). On the first of these issues—"inducement"—the accused bears the burden, ibid.,[3] the government, however, must prove the second issue—"predisposition"—beyond a reasonable doubt, see United States v. Riley, 363 F.2d 955 (2d Cir. July 12, 1966).

### III.

■ Bishop's main contention on this appeal is that the jury was not properly charged on the defense of entrapment. The charge indeed was not a model of clarity. But Bishop has no cause to complain, for in light of the evidence in this case he was, if anything, advantaged by the charge; he was not, in fact, entitled to *any* instruction relating to entrapment.

While we need not decide in the instant case whether Bishop's testimony denying the acts alleged to constitute a crime foreclosed the defense of entrapment,[4] we do hold that it was at least incumbent upon him to inform the court or prosecution (in the absence of the jury if he so elected), that he was raising entrapment as a defense. The Supreme Court said in *Sorrells*, supra: "[I]f the defendant seeks acquittal by reason of entrapment, he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." [5] 287 U.S. at 451, 53 S.Ct. at 216. It follows that unless the government is given some notice that entrapment is being urged as a defense, it cannot make its "appropriate and searching inquiry" into the defendant's predisposition and meet its burden of proof on this issue. Cf. United States v. Torres, 343 F.2d 750 (2d Cir. 1965). By failing to make a timely suggestion that entrapment was an issue in the case, we believe Bishop is precluded from raising this defense for the first time on appeal.[6] See United States v. Ladson, 294 F.2d 535, 538–540 (2d Cir.), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962). Any other rule would result in rewarding even a defendant who deliberately suppressed his de-

3. In United States v. Pugliese, 346 F.2d 861 (2 Cir. 1965), this Court reserved decision on the question of whether a defendant bears any burden of proof whatever on the issue of predisposition. Because the parties had not briefed the question in *Pugliese*, we did not decide whether Judge Hand's apportionment of the burden of proof set out in the *Sherman* case, should be reconsidered.

4. A difference in opinion exists among the various Circuits on this question. Compare United States v. Carter, 326 F.2d 351 (7th Cir. 1963), and Rodriguez v. United States, 227 F.2d 912 (5th Cir. 1955) with Hansford v. United States, 303 F.2d 219 (D.C.Cir. en banc 1962). See in this Circuit, United States v. Di Donna, 276 F.2d 956 (1960); United States v. Pagano, 207 F.2d 884 (1953). For the arguments in favor of allowing a defendant to deny the acts alleged to constitute a crime and still raise entrap-

ment as a defense, see Note, "Entrapment," 73 Harv.L.Rev. 1333, 1343 (1960).

5. When entrapment is raised as a defense, the Government is entitled to open up lines of evidence which are ordinarily unavailable, notably a record of related crimes, see Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 77 L.Ed. 413 (1932). See also Washington v. United States, 275 F.2d 687 (5th Cir. 1960) (use of hearsay evidence).

6. Bishop neither urged nor suggested during the trial that entrapment was an issue. In fact he did not even mention it in summation, or take exception to the Judge's charge or request a supplemental instruction. Defendants Duncan and Thompson, who did not appeal, did raise entrapment as a defense at the trial. It was at their request and not Bishop's that the trial judge charged the jury on entrapment.

fense of entrapment in order to preclude the government from establishing his predisposition.

## IV.

 Moreover, we find there was no factual question for a jury to consider on the issue of Bishop's predisposition. At the trial Bishop neither offered nor elicited any evidence to negate his propensity to commit the crime with which he was charged. This Court has recently declined to follow the ruling in Sagansky v. United States, 358 F.2d 195 (1st Cir. 1966) requiring the defense of entrapment to be submitted to the jury whenever any evidence of inducement is presented. "[E]ven when the inducement has been shown, submission to the jury is not required if uncontradicted proof has been established that the accused was 'ready and willing without persuasion' to have been 'awaiting any propitious opportunity to commit the offense.'" United States v. Riley, supra at 959 of 363 F.2d.

The only evidence which Bishop suggests controverted his predisposition to commit the crime, was the disclosure that none of the government's agents or informers knew him, or had prior knowledge that he was engaged in counterfeiting. We do not believe that such frail evidence is sufficient to send the defense of entrapment to the jury. If it were, then in virtually every narcotics and counterfeiting case the jury would have to be charged on and consider the defense, despite the fact that the only evidence on the issue was the apprehension of a previously unsuspected individual. The uncontradicted evidence in the present case showed only an anxious and ready defendant who jumped at the bait that was offered.

## V.

We have considered Bishop's other contentions and find them without merit.

The Court is indebted to James A. Fowler, Jr., Esq., who represented Bishop as assigned counsel on this appeal, for a most thorough presentation.

Affirmed.