UNITED STATES of America, Appellee,

v.

Harold F. MAYO, Jr. and Mark A. McGarghan, Defendants-Appellants.

Nos. 631, 632, Dockets 82–1256, 82–1258.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1982.

Decided April 8, 1983.

Jeanne Baker, Cambridge, Mass. (Baker & Fine, Cambridge, Mass., John J. Bergeron, Desautels & Bergeron, Inc., Burlington, Vt., of counsel), for defendant-appellant Mayo.

Stephen S. Blodgett, Burlington, Vt. (James R. Crucitti, Blodgett & Watts, Burlington, Vermont, of counsel), for defendant-appellant McGarghan.

Sheila M. Ware, Asst. U.S. Atty., George J. Terwilliger, III, Asst. U.S. Atty., D. Vt., Montpelier, Vt. (George W.F. Cook, U.S. Atty., Holly K. Harris, Asst. U.S. Atty., Dist. of Vt., Montpelier, Vt., of counsel), for appellee U.S.A.

Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Harold F. Mayo, Jr. and Mark A. McGarghan, two of six defendants below, appeal their convictions for assorted violations of the federal firearms laws. After a five week jury trial before Judge Coffrin of the United States District Court for the District of Vermont, Mayo was found guilty on four counts of receipt of a firearm by a convicted felon in violation of 18 U.S.C. § 922(h) (1976) (counts 3 through 6); two counts of unlawful transfer of a machine gun in violation of 26 U.S.C. § 5861(e) (1976) (counts 11 and 13); one count of unlawful possession of a machine gun in violation of 26 U.S.C. § 5861(d) (1976) (count 12); one count of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1) (1976) (count 16); two counts of aiding and abetting violations of 18 U.S.C. § 922(a)(1) (1976) (counts 17 and 18); and one count of conspiracy to commit the above offenses in violation of 18 U.S.C. § 371 (1976) (count 20). McGarghan was found guilty of unlawfully transferring a machine gun (count 13); unlawfully dealing in firearms without a license (count 17); conspiring to violate the firearms laws (count 20); and aiding and abetting violations of the firearms laws (counts 5, 6 and 16). Mayo was sentenced to four concurrent one-year terms of imprisonment plus five years probation. McGarghan received three concurrent six month prison terms plus three years probation.

I

In early 1980, agents of the United States Bureau of Alcohol, Tobacco and Firearms (BATF) were investigating possible firearms violations by John P. Cleary, the operator of a retail firearms business in Williston, Vermont named Cleary and Company.[1] In the course of the BATF investigation, an agent was informed by a Cleary and Company employee that Neil Chamandy, a Canadian citizen, was in the area trying to peddle modern firearms. An undercover BATF agent approached Chamandy and learned that he had tried to sell several modern weapons to Cleary. BATF secured Chamandy's help in its investigation and armed him with a transmitter to

---

1. Because John Cleary had been previously convicted of a firearms violation, Cleary and Company was operated under a license in the name of his wife.

record subsequent conversations with Cleary and others.[2]

Chamandy, who held himself out as a wealthy firearms broker and collector with a particular interest in antique firearms, called Cleary on July 11, 1980, and the two agreed to meet in Vermont later that month. When they met on July 28, Cleary purchased two of the four modern guns Chamandy had for sale. Cleary offered to introduce Chamandy to Harold Mayo who was reputed to have an extensive antique firearm business. Like Cleary, Mayo also had been convicted previously of violating the federal firearms law and, as a consequence, was not licensed to deal in modern firearms. Although 18 U.S.C. § 922(a)(1) (1976) makes it illegal to deal in firearms without a license, and 18 U.S.C. § 922(h) (1976) makes it unlawful for a convicted felon to receive firearms from interstate commerce, antique weapons can be lawfully traded without a license. Antique firearms are excepted from the definition of "firearm" in 18 U.S.C. § 921(a)(3) (1976), and include generally guns manufactured on or before 1898 as well as replicas of guns manufactured on or before 1898. 18 U.S.C. § 921(a)(16) (1976). Although Mayo could not lawfully purchase the weapons Chamandy had for sale, Cleary suggested that perhaps they could transact some business. Mayo agreed to meet with them that night at Cleary and Company.

Mayo arrived with a car trunk filled with both antique and modern weapons. From this assortment Chamandy purchased two Colt .22 caliber derringers for $250. This transaction formed the basis of counts 3 and 4 of the indictment. The recorded conversations showed that Mayo hoped to conduct further business with Chamandy: "I want to do a lot of business. I don't want to do $50 and it's all over. . . . Understand what I mean. I love buying. I don't like selling. . . ." (R115). However, Mayo declined to purchase Chamandy's modern weapons: "I wouldn't take them as a gift. . . . I really wouldn't. . . . I just don't know where . . . to go with them." (R146).

Mayo was eager to sell guns the following day. He described an array of firearms to Chamandy that were available for purchase. When Chamandy asked if Mayo could acquire "Teddy Roosevelts"—Winchester .30–.30 caliber commemorative rifles—Mayo responded: "Yeah and I can get 'em today." (R156). Chamandy also requested .32 caliber revolvers. Mayo said he had many, "about eight of them right now." (R163). Chamandy was pleased. He told Mayo: "I'll be very honest with you[,] I came with like twenty five thousand dollars in cash and I wanted to spend it. I will spend it with you." (R164).

Mayo located several available "Teddy Roosevelts" soon thereafter. He did not acquire the guns, however, because as the tapes showed he "wasn't supposed to have those, cause they're the modern type, ya know?" (R195). But, he reassured Chamandy that he would "get somebody to go get them, ya know?" (R197). They agreed to meet on August 7 in Burlington, Vermont to transact business. Mayo also hoped to introduce Chamandy to other gun-dealing friends.

Chamandy arrived in Burlington the morning of August 7 and took a room in a local motel. Mayo arrived at the motel that afternoon, his car loaded with firearms. Chamandy purchased nine guns from this collection, among them the two Teddy Roosevelt commemorative rifles that were the subjects of counts 5 through 8. Mayo was suspicious of Chamandy, but not so much so that he would refuse to deal with him;

**2.** Almost all communication between Chamandy and appellants was recorded on tape and played back to the jury. The only exception was the transaction involving a German Schmeisser machine gun discussed *infra*. The recording equipment failed the night of August 8, 1980 when Chamandy purchased the weapon in an abandoned parking lot. Chamandy testified at trial to the events of that evening. The cassette recordings and a transcript of their contents are part of the record on appeal. The background portion of this opinion quotes liberally from the transcript of the recordings. References thereto are preceded by the designation R.

Mayo said: "I figure .... [i]f I'm going to go to jail, I might just as well take the chance." (R213).

The following day, during one of several recorded phone conversations, Chamandy expressed interest in obtaining a machine gun. Mayo jumped at the opportunity: "I know where there's one. You could own ... one today." (R350). Mayo stated the price and offered to arrange delivery, but he insisted that he "wouldn't put [his] hand on it." (*Id.*) That afternoon, per Mayo's arrangement, he and Chamandy visited the homes of co-defendants John Crabbe and Frank Cota. Chamandy purchased modern guns from each. Later that evening, Mayo and Chamandy met co-defendant George Manieri in a parking lot.[3] Chamandy retrieved a German Schmeisser submachine gun from the front seat of Manieri's pickup truck and left in its place an envelope containing $325. Mayo ultimately pocketed some of the money. This transaction was the subject of counts 10 and 11. Afterwards, Mayo brought up the subject of a British Sten machine gun available for $225: "I just wanted to let ya know, ... I took the liberty to find out, ya know?" (R536).

Chamandy returned to Burlington on August 21. He was met this time by Mayo and co-appellant Mark McGarghan. The three retired to a motel room which Chamandy testified "was covered in guns .... on the floor ... on the dresser, guns everywhere." Trial Tr. at 1095. McGarghan testified that there were at most thirteen weapons in the motel room. Some of the guns were modern, others were antique. While Chamandy examined the merchandise, McGarghan left the room and went to a silver Camaro parked outside. The car had been seen earlier that day at Mayo's residence with Mayo and McGarghan standing nearby. BATF later discovered that the car was rented in McGarghan's name. McGarghan carried a box containing a British Sten submachine gun from the trunk of the Camaro and brought it back to the motel room. Chamandy's purchase of this

weapon formed the basis of counts 12 and 13. Chamandy's subsequent contact with both Mayo and McGarghan is not relevant to this case.

## II

### A. *Entrapment*

At trial counsel for Mayo and McGarghan claimed that their clients were small-town antique gun dealers enticed by a wealthy Canadian gun collector into selling several modern firearms in the hope of securing the Canadian's lucrative antique gun business. Both defendants asked the district court to charge the jury on the entrapment defense. Its refusal to deliver the requested charge is asserted as reversible error.

 An entrapment defense raises the questions:

(1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it.

*United States v. Sherman,* 200 F.2d 880, 882–83 (2d Cir.1952); *see United States v. Jannotti,* 673 F.2d 578, 597 (3d Cir.1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The defendant bears a "relatively slight" burden in showing inducement. *United States v. Henry,* 417 F.2d 267, 269 (2d Cir.1969), *cert. denied,* 397 U.S. 953, 90 S.Ct. 980, 25 L.Ed.2d 136 (1970). He need demonstrate only that the government initiated the crime. *United States v. Riley,* 363 F.2d 955, 958 (2d Cir. 1966). When inducement has been shown, the burden is cast on the government to establish by "substantial evidence," *United States v. Licursi,* 525 F.2d 1164, 1168 (2d Cir.1975), that the accused was "ready and willing without persuasion" and was "awaiting any propitious opportunity to commit the offence." *United States v. Sherman,* 200 F.2d at 882. While jury de-

---

**3.** Co-defendants Crabbe, Cota, Manieri and Cleary filed no appeal.

terminations of this issue are favored, *United States v. Anglada,* 524 F.2d 296, 298 (2d Cir.1975), the defendant is not automatically entitled to have the defense go to the jury whenever inducement is shown. *United States v. Bishop,* 367 F.2d 806, 810 (2d Cir.1966). If the government's evidence of propensity stands uncontradicted, there is no factual issue for the jury to resolve and the defense will not be submitted. *United States v. Licursi,* 525 F.2d at 1169. However, "any evidence negating propensity, whether in cross-examination or otherwise, requires submission to the jury, however unreasonable the judge would consider a verdict in favor of the defendant to be." *United States v. Riley,* 363 F.2d at 959; *see United States v. Fleishman,* 684 F.2d 1329, 1342 (9th Cir.1982) ("Whether there exist issues of fact as to a defense of entrapment is properly a question for the trial judge, the standard of review being abuse of discretion."), *cert. denied,* —— U.S. ——, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). In making this determination, the trial court must examine the record of the case "in the light most favorable to the defendant," *United States v. Anglada,* 524 F.2d at 298; *United States v. Dehar,* 388 F.2d 430, 433 (2d Cir. 1968), and with the understanding that resolution of "an issue of credibility as between the agent and the defendant ... is peculiarly within the jury's province," *United States v. Riley,* 363 F.2d at 958. The duty of the trial judge is easier to state than to apply—if inducement has been shown, entrapment must be submitted to the jury if there exists a genuine issue of fact concerning the accused's propensity to commit the crime.

The district court found that both Mayo and McGarghan had cleared the initial hurdle of inducement. The government's evidence established that, with the notable exception of the two Colt .22 caliber derringers that were the subjects of counts 2 and 3,

nearly every firearm sold to Chamandy was provided upon his request. As to the derringers, however, there was little evidence to support an inference that Chamandy induced their sale. Mayo brought the derringers with him to Cleary and Company the night he first met Chamandy. There was no evidence that Chamandy had solicited the derringers or had expressed any interest in buying modern weapons from Mayo. Nevertheless, Chamandy did set in motion the chain of events that led to his purchase of the derringers from Mayo. He came on the scene advertising great wealth and exhibiting a substantial interest in buying and selling both antique and modern firearms. It was Chamandy who suggested that Mayo might be interested in dealing in modern weapons and it was Chamandy who selected and purchased the derringers. As to McGarghan, there was no evidence that Chamandy induced him directly to deliver the Sten machine gun. Nevertheless, the district court moved past the threshold issue of inducement to consider the troublesome issue of propensity.[4]

■ Propensity can be established in many ways, among them proof of:

(1) an *existing course of criminal conduct* similar to the crime for which the defendant is charged, (2) an *already formed design* on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's *ready response to the inducement.*

*United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971) (emphasis added). The government produced substantial evidence of Mayo's predisposition to violate the firearms laws. *See United States v. Licursi,* 525 F.2d 1164, 1168 & n. 3 (2d Cir.1975) ("The prosecution must meet its burden of showing, by substantial evidence,

---

4. We need not consider whether there was sufficient evidence of inducement to entitle McGarghan to raise the entrapment defense, *see United States v. Valencia,* 645 F.2d 1158, 1168–69 (2d Cir.1981), *reh'g denied,* 669 F.2d 37 (2d Cir.1981), *aff'd after remand,* 677 F.2d

191 (2d Cir.1982), because we hold *infra* that McGarghan's testimony as to his non-involvement in the alleged criminal activity is inconsistent with a defense of entrapment and makes that defense unavailable to him.

that the defendant had a predisposition to commit the offense."). Mayo's 1975 conviction under the firearms laws, together with his unlawful possession of modern Colt derringers prior to meeting Chamandy, make out a course of criminal conduct suggesting predisposition. More telling was Mayo's ready and unhesitating response to Chamandy's inducement. Before they had ever met Mayo was gathering antique and modern guns to offer Chamandy. At all times thereafter, Mayo seemed eager to sell Chamandy whatever firearms he required. With each sale of modern weapons, Mayo suggested another transaction. Mayo was aware at all times that his conduct was illegal: "I wasn't supposed to have those, cause they're the modern type, ya know?" (R195); "I figure ... [i]f I'm going to go to jail, I might just as well take the chance." (R213). Whatever his motive, Mayo demonstrated an unhesitating willingness to commit the crimes for which he was convicted.

As to McGarghan, there was less evidence of predisposition. McGarghan met Chamandy only once. Yet McGarghan carried into that meeting the Sten submachine gun that Chamandy ultimately purchased. Moreover, the evidence indicated that Mayo and McGarghan had together obtained the "Teddy Roosevelt" commemorative rifles that were eventually sold to Chamandy. By his own account, McGarghan was an experienced collector of antique and modern guns, and was familiar with the requirements of the firearms laws. The district court refused to instruct the jury on the entrapment defense in light of the government's substantial, uncontradicted evidence of predisposition.

Mayo and McGarghan submit that under *United States v. Riley,* 363 F.2d 955 (2d Cir.1966), they have introduced sufficient evidence to contradict the government's showing of propensity. Appellants would have us rule that their evidence, which fails to contradict most of the government's showing, constituted the "*any* evidence negating propensity" that "requires submission [of the defense] to the jury." *Id.* at 959 (emphasis added). We cannot accept this interpretation of the *Riley* standard. In

*Riley* Judge Friendly set out to formulate a standard for determining when entrapment must be submitted to the jury. He rejected the argument that submission was required upon the mere showing of inducement. *See Sagansky v. United States,* 358 F.2d 195, 202–03 (1st Cir.), *cert. denied,* 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966). He also rejected the government's position that submission was not required where "the evidence on propensity so preponderates in its favor that the jury could not reasonably find for the defendant." 363 F.2d at 958. Judge Friendly preferred a "middle of the road solution:"

> submission to the jury is not required if uncontradicted proof has established that the accused was "ready and willing without persuasion" and to have been "awaiting any propitious opportunity to commit the offense." In such cases there is no real issue for the jury even though in strict theory it might create one by speculating that the agents had found the defendant less willing than they said. On the other hand, the production of any evidence negating propensity, whether in cross-examination or otherwise, requires submission to the jury, however unreasonable the judge would consider a verdict in favor of the defendant to be.

*Id.* at 959.

It is a mistake to divorce the language of *Riley* from the facts of *Riley.* Judge Friendly's underlying concern was that questions of fact concerning the government's instigation of criminal conduct go to the heart of the offense and, thus, demand resolution by a jury. He observed that "an issue of credibility as between the agent and the defendant ... is peculiarly within the jury's province." *United States v. Riley,* 363 F.2d at 958. The defendant in *Riley* vigorously attacked the prosecution's evidence of propensity. He narrated a "wholly different version" of the facts, *id.* at 957: the prosecution established Riley's lengthy criminal record, but he showed that his prior convictions were not for the same crime that he was accused of; the prosecution offered evidence of his readiness to

commit the crime charged, but he explained that his illegal sale of narcotics was solicited on the basis that the undercover agent "and his wife were sick and in desperate need of drugs." *Id.* at 959. Riley, himself an addict, took the stand to explain that the informant who introduced the government agent to him was "a friend [and] . . . partner in many opiate sessions." *Id.* Judge Friendly found Riley's testimony more than sufficient "to raise the issue whether he was 'ready and willing without persuasion,' to engage in the illegal conduct." *Id.*

█ Decisions after *Riley* confirm that the entrapment defense will not go to the jury in the face of substantial evidence of propensity unless the defendant produces some evidence to contradict directly the prosecution's showing. Thus, if the prosecution has firmly established the accused's willingness to commit the crime charged, submission is not required where the only contradictory evidence is the accused's testimony that he had never before engaged in the criminal conduct for which he was charged. *United States v. Licursi,* 525 F.2d 1164, 1169 (2d Cir.1975); *see United States v. Bishop,* 367 F.2d 806, 810 (2d Cir.1966). Similarly, where the government has established a track record of criminal activity on the part of the accused that matches the conduct for which he is charged, he is not entitled to have the entrapment defense go to the jury upon the mere showing that he was initially reluctant to commit the crime. *United States v. Barnes,* 604 F.2d 121, 161 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). In both *Licursi* and *Barnes,* the defendant failed to raise an issue of fact as to predisposition because the prosecution's evidence stood uncontradicted. Nevertheless, where the accused contradicts directly the government's evidence of propensity, submission is mandatory. *See United States v. Ordner,* 554 F.2d 24, 28 (2d Cir.), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977); *United States v. Cohen,* 431 F.2d 830, 832 n. 3 (2d Cir.1970); *United States v. Dehar,* 388 F.2d 430, 432–33 (2d Cir.1968). In *United States v. Anglada,* 524 F.2d 296 (2d Cir. 1975), propensity was established by the

agent's testimony of the defendant's ready and unhesitating response to his inducement. The defendant, however, preserved the defense by casting considerable doubt on the credibility of the agent—he "offered a different version of the transaction." *Id.* at 297.

█ *Riley* and its progeny establish that to contradict the government's evidence of propensity, the defendant must offer some evidence that is on target, some evidence that raises an issue of fact, however slight, concerning his propensity to commit the crime. A shot in the dark will not do. We will not sanction an interpretation of *Riley* which would require submission of the defense despite overwhelming uncontradicted evidence of predisposition. While the accused need not meet the government's showing with evidence of equal quantity and quality, he must at a minimum address the government's showing.

It is obvious that neither Mayo nor McGarghan have contradicted the government's showing of propensity. Mayo did contradict proof of his course of criminal conduct by producing the testimony of at least five individuals that he had restricted his activities to antique firearms ever since his 1975 conviction. However, the government also offered substantial evidence of Mayo's unhesitating willingness to sell Chamandy anything he wanted. This evidence stood uncontradicted. The transcript of the recorded conversations eliminated any issue of credibility as between Chamandy and appellants, *cf. United States v. Anglada,* 524 F.2d 296, 297, 299 (2d Cir.1975), and Mayo chose not to testify and explain his willingness to illegally sell firearms to Chamandy. Although Mayo told Chamandy on several occasions that he dealt only in antiques, his actions belie these self-serving statements. From the moment they met, Mayo supplied Chamandy with whatever he required.

Both Mayo, through his counsel, and McGarghan explain that their willingness to deal with Chamandy stemmed from their fervent desire to obtain his antique gun

business. There is no evidence in the record to show that either appellant attempted to translate his illegal trade of modern firearms into legitimate trade in antique guns. Rather than contradict propensity, appellants' unwitting testimony, the tape recordings, established it.[5] *See United States v. Barnes,* 604 F.2d 121, 161 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The appellants have failed to offer a convincing explanation for their conduct. Although a defendant is not required to testify at trial in order to preserve the defense, his testimony may be the only viable attack on predisposition where, as here, his unhesitating willingness to commit the crime is captured and preserved on tape. Mayo chose not to testify. McGarghan, however, took the stand.

Although the issue was not raised at trial or on appeal, McGarghan's claim to the entrapment defense recalls a thorny issue that has troubled this Court many times in the past and has divided the other circuits. Unlike Mayo, McGarghan's testimony addressed not only the government's evidence of predisposition, but also attacked the substance of the government's case against him. In essence, he denied participation in any of the transactions for which he was convicted. In many circuits, a defendant is not entitled to the entrapment defense if he denies complicity in the criminal acts alleged. *See, e.g., United States v. Nicoll,* 664 F.2d 1308, 1314 (5th Cir.1982), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982); *United States v. Annese,* 631 F.2d 1041, 1046–47 (1st Cir.1980); *United States v. Watson,* 489 F.2d 504, 507

(3d Cir.1973); *United States v. Johnston,* 426 F.2d 112, 114 (7th Cir.1970). Other circuits permit inconsistent defenses. *See, e.g., United States v. Demma,* 523 F.2d 981, 985 (9th Cir.1975) (en banc). Prior to this Court's decision in *United States v. Valencia,* 645 F.2d 1158 (2d Cir.1980), *reh'g denied,* 669 F.2d 37 (2d Cir.1981), *aff'd after remand,* 677 F.2d 191 (2d Cir.1982), this Court had declined several opportunities to address the issue.[6] *See id.* at 1170.

In *Valencia,* this Court considered whether "the defense of entrapment should not be available to a defendant who completely denies participation in the criminal acts alleged." *Id.* at 1170. William and Olga Valencia were charged with and convicted on several counts of violating the narcotics laws. The alleged criminal conduct was solicited by an undercover detective and a government informant. Consequently, both Olga and William claimed entrapment. Unlike William, Olga testified at trial and furnished sufficient evidence to establish that the government induced both her and William to participate in the criminal transaction. *Id.* at 1172 n. 19. William's attorney argued to the jury at the close of evidence "that William was in no way involved in the sale of [narcotics]." *Id.* at 1172. The trial judge submitted the defense of entrapment to the jury which returned a verdict convicting William on several counts and Olga on all counts.

Although William's convictions were subsequently reversed on other grounds, this Court considered the government's position that the argument delivered to the jury by

---

**5.** There is little evidentiary support for Mayo's explanation that his illegal sales of modern firearms to Chamandy were designed to foster a legitimate antique gun trade with him. At one point in their dealings, Mayo told Chamandy:

> I don't do this, like I told ya. Ya know, I was doing this just so you and I can get into my other stuff ya know? To the antiques, I'm hopin' you can leave me some money with antiques. I'm doin this as a favor to you. Ya understand what I'm sayin?

(R608). Although this isolated statement supports Mayo's explanation of his conduct, it deserves scant attention. It occurred on August

19, 1980, well after Mayo had sold Chamandy many guns, including the Colt derringers, the Winchester commemorative rifles, and the Schmeisser machine gun. Two days after this conversation, Mayo and McGarghan delivered the Sten machine gun to Chamandy.

**6.** We refer the reader to Judge Oakes' comprehensive presentation of the case law addressing the question whether a defendant can claim entrapment and at the same time argue non-involvement in *United States v. Valencia,* 645 F.2d 1158 (2d Cir.1980), *reh'g denied,* 669 F.2d 37 (2d Cir.1981), *aff'd after remand,* 677 F.2d 191 (2d Cir.1982).

William's attorney—that William was not involved in any narcotics transactions—made the entrapment defense unavailable. After an exhaustive review of the case law, this Court concluded:

William Valencia, having put the Government on notice in counsel's opening statement of the assertion of the dual defenses of entrapment and non-involvement, is entitled to raise the defense of entrapment since he did not take the stand to deny personally his participation in the transaction and did not affirmatively introduce any other evidence that he was not involved.

*Id.* at 1172. Expressly left open for future consideration was the precise question presented here, whether "the entrapment defense [is] available to a defendant who actually testifies that he did not participate in the alleged criminal activity." *Id.*

 McGarghan took the stand and denied involvement in the criminal conduct alleged. He was accused in counts 5 and 6 of aiding and abetting Mayo's sale of two Winchester commemorative rifles to Chamandy. Although McGarghan was not present when the transaction took place, a government witness testified that he had delivered the two rifles to McGarghan earlier that year. A conviction for aiding and abetting requires proof that the defendant "associate[d] himself with the venture, . . . participate[d] in it as in something that he wish[ed] to bring about," and sought "by his action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938); *see United States v. Perry,* 643 F.2d 38, 46 (2d Cir.), *cert. denied* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981); *United States v. Clemente,* 640 F.2d 1069, 1078–79 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981). McGarghan denied any association with or knowledge of the activity alleged in counts 5 and 6:

Q: Now, you have heard the testimony . . . concerning the so-called Teddy Roosevelts which have been identified here in Court?

A: Yes, I have.

Q: When was the first time you saw those Teddy Roosevelts?

A: In Court.

Trial Tr. at 1800. McGarghan was charged in count 17 with unlicensed dealing in firearms in violation of 18 U.S.C. § 922(a)(1) (1976). McGarghan flatly denied this charge:

Q: Have you ever dealt in modern weapons for profit?

A: No, I have not.

Trial Tr. at 1837. Count 13 alleged that McGarghan unlawfully transferred a British Sten submachine gun to Chamandy on August 21. McGarghan admitted to being present when the weapon was given to Chamandy, but he denied having participated in the transfer:

Q: Do you recall introduction of the so-called Sten gun into evidence here?

A: Yes, I do.

. . . . .

Q: Had you seen that particular unit before it was removed from its container in the Ramada Inn?

A: No, I had not.

Q: Concerning that, were you involved in any of the preliminary conversations to acquire it, the Sten gun?

A: No, sir, I was not.

Q: Did you pay any money in connection with it?

A: No, sir, I did not.

Q: Did you receive any money in connection with it?

A: No, sir, I did not.

Q: Did you exercise any control over how that transaction was supposed to be conducted?

A: No.

Trial Tr. at 1829–30. The transaction for the submachine gun was realleged in count 20 as an overt act connecting McGarghan to a conspiracy to violate the firearms laws. His testimony, therefore, denied involvement in the alleged conspiracy.

 We cannot reconcile McGarghan's argument that he was induced by Chamandy to commit the alleged offenses with his

testimony that he was not involved in the alleged criminal conduct. He chose to testify and to defend on the grounds of non-involvement and the proof offered to support this defense negated any possibility of entrapment. In these circumstances, we do not believe that McGarghan was entitled to the defense of entrapment. We need not decide here how we would rule if McGarghan had not denied the acts alleged in the indictment, but instead had admitted the acts and offered an explanation of his conduct that was consistent with his theory of entrapment. *See Henderson v. United States,* 237 F.2d 169, 173 (5th Cir.1956). That issue is better left for another day. In this case, it was not error for the district court to refuse McGarghan's request for a jury instruction on entrapment.

█ The district court correctly concluded that neither Mayo nor McGarghan was entitled to the entrapment defense. The government's evidence of propensity established appellants' unhesitating willingness to commit the offenses charged. Mayo offered not a scintilla of evidence to demonstrate his reluctance. *See United States v. Fera,* 616 F.2d 590, 596 (1st Cir.) ("A factual issue sufficient to require submission to a jury arises only if his evidence amounts to more than a mere scintilla."), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980). McGarghan's testimony did not contradict the government's evidence of propensity, but rather addressed the substantive allegations in the indictment. *See United States v. Licursi,* 525 F.2d 1164, 1169 (2d Cir.1975). This is not a case where "the Government's deception actually implant[ed] the criminal design in the mind of the defendant." *United States v. Russell,* 411 U.S. 423, 435–36, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). On the contrary, Mayo brought his criminal bent to Chamandy and McGarghan soon followed suit. Chamandy did not conceive or plan the offenses, he merely provided an opportunity for them to occur. *United States v. Jones,* 693 F.2d 343, 347 (5th Cir.1982); *United States v. Fleishman,* 684 F.2d 1329, 1343 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982). The opportunity was surely created by charade, but the offenses were not induced by trickery, persuasion or fraud. *See Sorrells v. United States,* 287 U.S. 435, 445, 452, 53 S.Ct. 210, 214, 216, 77 L.Ed. 413 (1932). Both Mayo and McGarghan knew what they were doing. There was no error.

## B. *Sufficiency of the Evidence*

Both Mayo and McGarghan contend that the government's proof was insufficient to support their convictions under 18 U.S.C. § 922(h) & (a)(1) (1976). Section 922 applies only to transactions involving a "firearm," which is defined in 18 U.S.C. § 921(a)(3) (1976) as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. *Such term does not include an antique firearm.*

(emphasis added). Antique firearms are separately defined in 18 U.S.C. § 921(a)(16) (1976) as:

(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and (B) any replica of any firearm described in subparagraph (A) if such replica—

(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

Mayo and McGarghan argue that their convictions under section 922 must be reversed because the government failed to prove an essential element of the crime. They concede that there was sufficient proof that the firearms involved in the section 922 counts were weapons capable of expelling a projectile by means of an explosion and were manufactured after 1898. 18

U.S.C. § 921(a)(3) & (a)(16)(A) (1976). However, they point to the government's failure to prove that the subject transactions did not involve "antique firearms" as defined in 18 U.S.C. § 921(a)(16)(B) (1976) —replicas of firearms manufactured prior to 1898.[7] Resolution of this issue turns on whether the final sentence of 18 U.S.C. § 921(a)(3) establishes an affirmative defense or an additional element that the government must prove to establish the crime.

 It has long been recognized that statutes which provide affirmative defenses in the form of exceptions to a general proscription do not reduce or remove the government's traditional burden of proving beyond a reasonable doubt every fact necessary to constitute the offense.

Long before *Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)], the universal rule in this country was that the prosecution must prove guilt beyond a reasonable doubt. At the same time, the long-accepted rule was that it was constitutionally permissible to provide that various affirmative defenses were to be proved by the defendant.

*Patterson v. New York,* 432 U.S. 197, 211, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977). In these situations, the legislature has manifested its judgment that the activity proscribed by the general prohibition can be best justified or explained by the defendant. *See id.* at 209 n. 11, 97 S.Ct. at 2326 n. 11. Exceptions to a general prohibition are a legitimate means to implement a legislative design and often serve to define the scope of the prohibition.

The government does not argue that the appellants bore the burden of proof or persuasion on the antique firearm exception. Instead, the government contends that the antique firearms exception in 18 U.S.C. § 921(a)(3) is a form of affirmative defense on which the appellants were obligated to *produce* some evidence to put the exception at issue before the government was obligated to prove its inapplicability beyond a reasonable doubt.[8] In *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922), the Court held that:

> an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other

---

7. In its opinion and order addressing post-trial motions made by the defendants, the district court denied Mayo's motion, joined by McGarghan, for judgment of acquittal on several counts based on 18 U.S.C. § 922. The district court cited an agreed request to charge signed by counsel for the government, Mayo and Cleary which had been delivered to the jury. The agreed charge included the full language of 18 U.S.C. § 921(a)(16), but closed with the following paragraph:

> You can expect to hear testimony concerning MODERN versus ANTIQUE firearms. For the purposes of this trial, MODERN FIREARMS are those which were manufactured after the year 1898, and ANTIQUE FIREARMS are those which were manufactured in the year 1898 or prior to that date.

J.App. at 57. The district court reasoned that "[b]y entering into this stipulation, defendant Mayo removed from the case the issue of whether the weapons were 'replica[s].'" J.App. at 95. Consequently, the motion for judgment of acquittal was denied. We need not consider the correctness of the district court's ruling on this motion because the appellants failed to produce any evidence to put the "replica" exception at issue.

8. Appellants interpret *United States v. Morningstar,* 456 F.2d 278 (4th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972), as imposing on the government the burden of disproving in all cases the applicability of an exception to a statutory definition in the firearms laws. In *Morningstar,* the defendant was indicted for unlawfully transporting, concealing and possessing a "destructive device" in violation of 18 U.S.C. § 922(i). The district court granted the defendant's motion to dismiss the indictment on the grounds that black powder and blasting caps were not within the definition of "destructive device." The Fourth Circuit reversed, noting that Congress exempted from the statutory definition certain devices depending on their intended use. Appellants here highlight the court's observation that "[w]e do not view [the exemption] as simply creating an affirmative defense." Appellants ignore, however, the court's subsequent description of the government's burden of proof at trial—notably absent was any suggestion that the government was obligated to disprove the applicability of the exemption. *Id.* at 281–82.

distinct clause, whether in the same section or elsewhere... [I]t is *incumbent on one who relies on such an exception to set it up and establish it.*

*Id.* at 357, 43 S.Ct. at 134. *See United States v. Stout,* 667 F.2d 1347, 1353 (11th Cir.1982); *United States v. Guess,* 629 F.2d 573, 576 (9th Cir.1980); *United States v. Henry,* 615 F.2d 1223, 1234–35 (9th Cir. 1980). The minimal burden placed on the defendant relying on a statutory exception does not impinge on constitutional rights because the government ultimately bears the burden of disproving the applicability of the exception when it is properly presented. *See Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975) ("We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case."); *United States v. Oba,* 448 F.2d 892, 894 (9th Cir.1971) ("affirmative defense, ... if asserted, must be negated beyond a reasonable doubt by the prosecution"), *cert. denied,* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972).

We begin with the text of 18 U.S.C. § 921(a)(3) (1976) to determine whether the language excluding antique weapons from the term firearm carves an exception which must be put in issue by the defendant or, instead, appends an additional element which the government must disprove beyond a reasonable doubt to establish the crime. The first sentence defines firearms in the broadest sense of the word. The second sentence carves a narrow exception —"[s]uch term does not include an antique firearm"—and references 18 U.S.C. § 921(a)(16) (1976) for a definition of "antique firearms."

▆ The Supreme Court in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), described an affirmative defense as one that "does not serve to negative any facts of the crime." *Id.* at 206–07, 97 S.Ct. at 2325. One weapon could satisfy both the broad definition of firearm in 18 U.S.C. § 921(a)(3) (1976) as well as the narrow exception in 18 U.S.C. § 921(a)(16) (1976). In the present case, the government proved that the weapons involved in the section 922 counts were firearms within the meaning of 18 U.S.C. § 921(a)(3). Proof establishing that these same weapons were antiques within the meaning of section 921(a)(16) would not negative any of the government's proof. By its terms, the statute creates an affirmative defense in the form of an exception. We find no indication in the language of the statute that Congress intended the government to prove in all criminal prosecutions under 18 U.S.C. § 922 that the illegal firearms transactions involved weapons that were not antiques.

▆ The legislative history of the statute supports our interpretation. Title IV of the Omnibus Crime Control and Safe Streets Act of 1968 (Omnibus Act), Pub. L.No. 90–351, 82 Stat. 225, established a comprehensive federal regulatory scheme to monitor and control interstate and international movement of firearms. It reflected a deep-seated congressional concern over the "widespread traffic in firearms" that Congress considered "a significant factor in the prevalence of lawlessness and violent crime in the United States." Omnibus Act § 901(a), 82 Stat. 225. The regulatory scheme established stringent licensing and reporting requirements governing persons who deal in firearms. The antique firearm exception was born of congressional concern that an all-encompassing regulatory scheme could unduly burden the legitimate interests of citizens in antique firearms. Congress did not intend

to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures

or requirements other than those reasonably necessary to implement and effectuate the [firearms laws].

Gun Control Act of 1968, § 101, Pub.L. No. 90–618, 82 Stat. 1213–14 (amending and adding to existing regulatory scheme). *See United States v. Jones,* 481 F.2d 653, 654–55 (2d Cir.1973); *United States v. Reminga,* 493 F.Supp. 1351, 1353 (W.D.Mich.1980) (firearms laws reflect accommodation of competing interests of law enforcement and legitimate private ownership of firearms). Congress was not constitutionally required to exempt antique firearms from the firearms laws. Congress did, however, provide a "gratuitous defense" to safeguard the rights of persons who deal in a narrow class of weapons. *Cf. United States ex rel. Goddard v. Vaughn,* 614 F.2d 929, 935 (3d Cir.) (voluntary intoxication affirmative defense to specific intent crime), *cert. denied,* 449 U.S. 844, 101 S.Ct. 127, 66 L.Ed.2d 53 (1980). In these circumstances, we will not thwart the primary thrust of the federal firearms laws and unduly stifle effective enforcement of those laws by requiring the government in all prosecutions under 18 U.S.C. § 922 to prove that the weapons involved were not antique firearms. While it would not be an impossible burden for the government to bear, a legitimate antique gun dealer or collector is certainly in a better position to place the exception in issue. *Cf. United States v. Carr,* 582 F.2d 242, 245 (2d Cir.1978). Both Mayo and McGarghan defended on the ground that they dealt only in antique weapons. Yet, neither offered a shred of evidence suggesting that the guns involved in the section 922 counts were antique firearms as defined in 18 U.S.C. § 921(a)(16) (1976).[9] The government produced sufficient evidence from which the jury could conclude that Mayo and McGarghan illegally dealt in firearms.[10]

## C. Due Process Claims

The district court denied Mayo's and McGarghan's pre- and post-trial motions to dismiss the indictment on due process grounds. Our discussion of these rulings is brief because we find no merit in appellants' assertions of error.

**9.** Mayo was charged and prosecuted for both receipt of the Winchester commemorative rifles in violation of 18 U.S.C. § 922(a)(1) (counts 5 and 6) and possession of those same rifles in violation of 18 U.S.C.App. § 1202 (counts 7 and 8). He was convicted on counts 5 and 6, but acquitted on counts 7 and 8. As an independent assertion of error, Mayo argues that the district court improperly denied his pretrial motion to require the government to elect between prosecuting him under either section 922(a)(1) or section 1202. *See United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). We will not resolve this thorny issue which has the circuits divided, *compare United States v. Larranaga,* 614 F.2d 239 (10th Cir. 1980) (prosecution may proceed under two related statutes), *with United States v. Larson,* 625 F.2d 67 (5th Cir.1980) (prosecution not permitted to proceed under two related statutes), because Mayo has failed to demonstrate how he was prejudiced. Although he was prosecuted under two statutes that refer to different definitions of firearms (section 1202 not having an exception for antique firearms), we do not think the jury was confused as a result. The statutory definition of firearms for the purposes of 18 U.S.C. § 922(a)(1) was delivered verbatim to the jury.

**10.** Mayo also contends that the government's proof was insufficient to support his conviction on count 12 which charged him with unlawful possession of the British Sten machine gun in violation of 26 U.S.C. § 5861(d) (1976). Section 5861(d) makes it unlawful for a person to possess a firearm that is not registered to him in the National Firearms Registration and Transfer Record. The government entered into evidence a certificate from a BATF examiner certifying that, "after deligent [sic] search of said record, I found no record that the firearms described below [British Sten machinegun] are registered to, or have been acquired by lawful making, transfer or importation by HAROLD F. MAYO, JR. . . . ." J.App. at 103. Because the certificate was dated October 7, 1980, Mayo argues that it does not prove non-registration as of the date of the indictment, August 21, 1980. This deficiency was compounded, in Mayo's view, by the district court's instruction to the jury that the certificate established registration on August 21, 1980. We reject Mayo's argument for several reasons. Considering the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the jury could have reasonably inferred that the BATF examiner did not limit her examination of the record to those weapons registered only on October 7, 1980. Moreover, the jury was presented with evidence showing that Mayo, as a convicted felon, could not lawfully have firearms registered to him.

Prior to trial, appellants' counsel interviewed Chamandy in the presence of a United States Attorney. During the interview, the government attorney repeatedly reminded Chamandy that he was not obligated to speak with defense counsel. Although appellants recognize that they had no right to have Chamandy respond to their questions, *United States v. Rice,* 550 F.2d 1364, 1374 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977), they argue that the government, having agreed to the interview, should have remained neutral during the questioning, *United States v. Rich,* 580 F.2d 929, 934 (9th Cir.), *cert. denied,* 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978). Appellants contend that the government's interference impaired their right to a fair trial. *United States v. Clemones,* 577 F.2d 1247, 1252 (5th Cir.), *modified,* 582 F.2d 1373 (5th Cir.1978) (per curiam). The district court rightly concluded that the government attorney did not exceed the bounds of propriety. The transcript of the interview indicates that the government attorney intervened only after the defendants' attorneys made repeated attempts to persuade Chamandy to broach subjects he had expressly refused to discuss. In addition, appellants have not shown how the limited interview of Chamandy prejudiced their case in light of the extensive cross-examination of Chamandy permitted at trial. *See United States v. Leonard,* 524 F.2d 1076, 1093 (2d Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

Appellants next argue that their right to a fair trial was infringed by the government's failure to charge Chamandy with perjury and other crimes allegedly revealed in the record. They urge this Court to hold that the government has an affirmative duty to charge its witnesses with crimes it learns the witnesses have committed. Appellants' position is without support and we decline to adopt it. *See United States v. Myers,* 692 F.2d 823, 846 (2d Cir. 1982) (Due Process Clause does not forbid "use of dishonest and deceitful informants"). The decision whether to prosecute lies in the discretion of the prosecutor, *Inmates of Attica Correctional Facility v. Rockefeller,* 477 F.2d 375, 380 (2d Cir.1973), and the facts of this case do not suggest that he abused his discretion. Moreover, appellants cannot show prejudice. They were afforded wide latitude in their cross-examination of Chamandy and, in any event, Chamandy's credibility was not a significant issue because the illegal transactions were for the most part recorded on tape.

Finally, appellants argue that the entire United States Attorney's Office for the District of Vermont should have been disqualified for its failure to recognize or prosecute Chamandy's alleged bribery of that office. Appellants contend that the government compromised itself and created an expectation that Chamandy would receive more than standard witness fees when it entered into an agreement with Chamandy providing for compensation to him "at a level to be determined by the BATF." Appellants insisted in the district court that Chamandy be prosecuted for violating 18 U.S.C. § 201(i) (1976), which prohibits the exchange of testimony under oath for anything other than standard fees set by law plus incidental expenses. *See* 18 U.S.C. § 201(j) (1976). The agreement between the government and Chamandy did not require compensation to Chamandy in excess of that provided for by law.

### D. *Defective Indictment*

Count 13 of the indictment alleged that Mayo and McGarghan unlawfully transferred a British Sten machine gun in violation of 26 U.S.C. § 5861(e) (1976). Count 11 alleged that Mayo unlawfully transferred a German Schmeisser machine gun in violation of the same statute. Mayo and McGarghan contend that the district court erroneously denied their pre- and post-trial motions to dismiss count 13 on the ground that the allegations therein failed to adequately apprise them of the conduct alleged to be unlawful. In addition, Mayo now claims for the first time that the allegations in count 11 were similarly deficient.

"An indictment need only provide sufficient detail to assure against double jeopardy and state the elements of the offense charged, thereby apprising the defendant of what he must be prepared to meet." *United States v. Tramunti,* 513 F.2d 1087, 1113 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). Under this standard, the allegations in counts 11 and 13 were sufficient to apprise appellants of the conduct alleged to have violated 26 U.S.C. § 5861(e) (1976). *Russell v. United States,* 369 U.S. 749, 759–60, 82 S.Ct. 1038, 1044, 8 L.Ed.2d 240 (1962). Under that statute, it is unlawful "to transfer a firearm in violation of the provisions of [Chapter 53 of Title 26, U.S.C.]." The indictment tracked the language of the statute and, moreover, specified the time and place of the allegedly illegal transfer. This information adequately identifies the illegal transaction and is sufficient to withstand constitutional scrutiny. *United States v. Tramunti,* 513 F.2d at 1113 ("an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime"). It might have been preferable to have identified the provisions of Chapter 53 that were violated by the allegedly unlawful transfer, *see* 26 U.S.C. § 5812 (1976), but it was certainly not necessary.

E. *Guilty Knowledge*

Finally, we reject McGarghan's argument that the district court erroneously refused to give the requested jury charge that:

[I]f you find that Defendant McGarghan transferred the so-called Sten gun, but believed that it was an unserviceable firearm as just defined for you, then the Government would have failed to establish the essential element of guilty knowledge, and your verdict as to Count 13 . . . should be not guilty.

Supp.App. at 172–73. There was no error because the requested instruction was wrong as a matter of law. A conviction for violating 26 U.S.C. § 5861(e) (1976) requires only that the defendant knowingly transferred an unregistered firearm. *See United States v. Woodruff,* 600 F.2d 174, 175–76 (8th Cir.1979). McGarghan transferred what he knew to be a machine gun. His belief that the weapon was inoperable is irrelevant. The statute applies with equal vigor both to machine guns that are operable and those that "can be readily restored to shoot." 26 U.S.C. § 5845(b) (1976). Guilty knowledge is not an element of the offense detailed in 26 U.S.C. § 5861(e). It is not a specific intent crime. *See United States v. Moschetta,* 673 F.2d 96, 100 (5th Cir.1982) (26 U.S.C. § 5861(d) does not require proof of specific intent).

## CONCLUSION

Having considered appellants' many assertions of error and having found each without merit, we affirm the judgments of conviction on all counts.